Francis X. McQuade, Respondent, *v.* Charles A. Stoneham et al., Appellants.

(Argued December 4, 1933; decided January 18, 1934.)

*Nathan L. Miller, Harold H. Corbin, Edward J. Bennett* and *Leo J. Bondy* for appellants. The contract is void as against public policy in so far as it imposes any obligation on the appellants to elect or continue, or to urge the continuance of, the respondent in office as treasurer. (*Manson* v. *Curtis*, 223 N. Y. 313; *Fells* v. *Katz*, 256 N. Y. 67; *Caskie* v. *International Ry. Co.*, 261 N. Y. 47; *Fennessy* v. *Ross*, 5 App. Div. 342; *Fabre* v. *O'Donohue*, 185 App. Div. 779; *Odell* v. *Wells*, 183 App. Div. 242; *Flaherty* v. *Carey*, 62 App. Div. 116; *Abbott* v. *Harbeson Textile Co.*, 162 App. Div. 405; *West* v. *Camden*, 135 U. S. 507; *Guernsey* v. *Cook*, 120 Mass. 501; *Jackson* v. *Hooper*, 76 N. J. Eq. 592; *Teich* v. *Kaufman*, 174 Ill. App. 306; *Snow* v. *Church*,

13 App. Div. 108; *Leland* v. *Ford*, 245 Mich. 599; *Van Slyke* v. *Andrews*, 178 N. W. Rep. 959; *Gilchrist* v. *Hatch*, 100 N. E. Rep. 473; 106 N. E. Rep. 694; *Hellier* v. *Achorn*, 151 N. E. Rep. 305; *Seitz* v. *Michel*, 181 N. W. Rep. 102.) Plaintiff, at the time the agreement sued on was entered into, and until a time subsequent to the commencement of the action, was a City Magistrate which prohibits a recovery. (Inferior Criminal Courts Act, § 102 [Laws of 1915, ch. 531].)

*Joseph M. Proskauer, Isaac N. Jacobson* and *J. Alvin Van Bergh* for respondent. The contract is not against public policy. (*Manson* v. *Curtis*, 223 N. Y. 313; *Fells* v. *Katz*, 256 N. Y. 67; *Barnes* v. *Brown*, 80 N. Y. 527.) Agreements among the majority stockholders, in so far as they provide merely for election of particular persons to office in the corporation, are valid though not binding upon the directors. (*Lorillard* v. *Clyde*, 86 N. Y. 384; 99 N. Y. 196; *Bonta* v. *Gridley*, 185 N. Y. 614; *Drucklieb* v. *Harris*, 209 N. Y. 211; *Bliss* v. *Matteson*, 45 N. Y. 22; *Kreitner* v. *Burgweger*, 174 App. Div. 48; *Fells* v. *Katz*, 256 N. Y. 67; *Faulds* v. *Yates*, 57 Ill. 416; *Kantzler* v. *Bensinger*, 214 Ill. 589; *Venner* v. *Chicago City Ry. Co.*, 258 Ill. 523; *Thompson* v. *Thompson Carnation Co.*, 279 Ill. 54; *Smith* v. *S. F. & N. P. Ry. Co.*, 115 Cal. 584; *Winsor* v. *Commonwealth Coal Co.*, 63 Wash. 62; *Brightman* v. *Bates*, 175 Mass. 105; *Weber* v. *Della Mountain Min. Co.*, 14 Ida. 404; *Robertson* v. *First Nat. Bank*, 35 Ida. 363.) Section 102 (now section 161) of the Inferior Criminal Courts Act does not prohibit recovery. (*Matter of Deuel*, 127 App. Div. 640; *Matter of Levy*, 198 App. Div. 326; *Dunham* v. *Hastings Pavement Co.*, 56 App. Div. 244; *Russell Co.* v. *Utica Co.*, 195 N. Y. 54.)

POUND, Ch. J. The action is brought to compel specific performance of an agreement between the parties, entered into to secure the control of National Exhibition Company, also called the Baseball Club (New York Nationals

or " Giants "). This was one of Stoneham's enterprises which used the New York polo grounds for its home games. McGraw was manager of the Giants. McQuade was at the time the contract was entered into a City Magistrate. He resigned December 8, 1930.

Defendant Stoneham became the owner of 1,306 shares, or a majority of the stock of National Exhibition Company. Plaintiff and defendant McGraw each purchased seventy shares of his stock. Plaintiff paid Stoneham $50,338.10 for the stock he purchased. As a part of the transaction the agreement in question was entered into. It was dated May 21, 1919. Some of its pertinent provisions are

" VIII. The parties hereto will use their best endeavors for the purpose of continuing as directors of said Company and as officers thereof the following:

Directors:

Charles A. Stoneham,
John J. McGraw,
Francis X. McQuade,

with the right to the party of the first part [Stoneham] to name all additional directors as he sees fit:

Officers:

Charles A. Stoneham, President,
John J. McGraw, Vice-President,
Francis X. McQuade, Treasurer.

" IX. No salaries are to be paid to any of the above officers or directors, except as follows:

President............................. $45,000
Vice-President........................ 7,500
Treasurer............................. 7,500

" X. There shall be no change in said salaries, no change in the amount of capital, or the number of shares, no change or amendment of the by-laws of the corporation or any matters regarding the policy of the business of the corporation or any matters which may in anywise affect, endanger or interfere with the rights of minority stock-

holders, excepting upon the mutual and unanimous consent of all of the parties hereto.

\*  \*  \*  \*  \*  \*  \*

"XIV. This agreement shall continue and remain in force so long as the parties or any of them or the representative of any, own the stock referred to in this agreement, to wit, the party of the first part, 1,166 shares, the party of the second part 70 shares and the party of the third part 70 shares, except as may otherwise appear by this agreement  \*  \*  \*."

In pursuance of this contract Stoneham became president and McGraw vice-president of the corporation. McQuade became treasurer. In June, 1925, his salary was increased to $10,000 a year. He continued to act until May 2, 1928, when Leo J. Bondy was elected to succeed him. The board of directors consisted of seven men. The four outside of the parties hereto were selected by Stoneham and he had complete control over them. At the meeting of May 2, 1928, Stoneham and McGraw refrained from voting, McQuade voted for himself and the other four voted for Bondy. Defendants did not keep their agreement with McQuade to use their best efforts to continue him as treasurer. On the contrary, he was dropped with their entire acquiescence. At the next stockholders' meeting he was dropped as a director although they might have elected him.

The courts below have refused to order the reinstatement of McQuade, but have given him damages for wrongful discharge, with a right to sue for future damages.

The cause for dropping McQuade was due to the falling out of friends. McQuade and Stoneham had disagreed. The trial court has found in substance that their numerous quarrels and disputes did not affect the orderly and efficient administration of the business of the corporation; that plaintiff was removed because he had antagonized the dominant Stoneham by persisting in challenging his power over the corporate treasury and for no misconduct on his part. The court also finds that plaintiff was removed by Stoneham for protecting the corporation

and its minority stockholders. We will assume that Stoneham put him out when he might have retained him, merely in order to get rid of him.

Defendants say that the contract in suit was void because the directors held their office charged with the duty to act for the corporation according to their best judgment and that any contract which compels a director to vote to keep any particular person in office and at a stated salary is illegal. Directors are the exclusive executive representatives of the corporation, charged with administration of its internal affairs and the management and use of its assets. They manage the business of the corporation. (Gen. Corp. Law; Cons. Laws, ch. 23, § 27.) " An agreement to continue a man as president is dependent upon his continued loyalty to the interests of the corporation." (*Fells* v. *Katz*, 256 N. Y. 67, 72.) So much is undisputed.

Plaintiff contends that the converse of this proposition is true and that an agreement among directors to continue a man as an officer of a corporation is not to be broken so long as such officer is loyal to the interests of the corporation and that, as plaintiff has been found loyal to the corporation, the agreement of defendants is enforceable.

Although it has been held that an agreement among stockholders whereby it is attempted to divest the directors of their power to discharge an unfaithful employee of the corporation is illegal as against public policy (*Fells* v. *Katz, supra*), it must be equally true that the stockholders may not, by agreement among themselves, control the directors in the exercise of the judgment vested in them by virtue of their office to elect officers and fix salaries. Their motives may not be questioned so long as their acts are legal. The bad faith or the improper motives of the parties does not change the rule. (*Manson* v. *Curtis*, 223 N. Y. 313, 324.) Directors may not by agreements entered into as stockholders abrogate their

independent judgment. (*Creed* v. *Copps*, 103 Vt. 164; 71 A. L. R., Annotated, p. 1287.)

Stockholders may, of course, combine to elect directors. That rule is well settled. As HOLMES, Ch. J., pointedly said (*Brightman* v. *Bates*, 175 Mass. 105, 111): " If stockholders want to make their power felt, they must unite. There is no reason why a majority should not agree to keep together." The power to unite is, however, limited to the election of directors and is not extended to contracts whereby limitations are placed on the power of directors to manage the business of the corporation by the selection of agents at defined salaries.

The minority shareholders whose interests McQuade says he has been punished for protecting, are not, aside from himself, complaining about his discharge. He is not acting for the corporation or for them in this action. It is impossible to see how the corporation has been injured by the substitution of Bondy as treasurer in place of McQuade. As McQuade represents himself in this action and seeks redress for his own wrongs, " we prefer to listen to [the corporation and the minority stockholders] before any decision as to their wrongs." (*Faulds* v. *Yates*, 57 Ill. 416, 421.)

It is urged that we should pay heed to the morals and manners of the market place to sustain this agreement and that we should hold that its violation gives rise to a cause of action for damages rather than base our decision on any outworn notions of public policy. Public policy is a dangerous guide in determining the validity of a contract and courts should not interfere lightly with the freedom of competent parties to make their own contracts. We do not close our eyes to the fact that such agreements, tacitly or openly arrived at, are not uncommon, especially in close corporations where the stockholders are doing business for convenience under a corporate organization. We know that majority stockholders, united in voting trusts, effectively manage the business of a corporation

by choosing trustworthy directors to reflect their policies in the corporate management. Nor are we unmindful that McQuade has, so the court has found, been shabbily treated as a purchaser of stock from Stoneham. We have said: " A trustee is held to something stricter than the morals of the market place " (*Meinhard* v. *Salmon*, 249 N. Y. 458, 464), but Stoneham and McGraw were not trustees for McQuade as an individual. Their duty was to the corporation and its stockholders, to be exercised according to their unrestricted lawful judgment. They were under no legal obligation to deal righteously with McQuade if it was against public policy to do so.

The courts do not enforce mere moral obligations, nor legal ones either, unless someone seeks to establish rights which may be waived by custom and for convenience. We are constrained by authority to hold that a contract is illegal and void so far as it precludes the board of directors, at the risk of incurring legal liability, from changing officers, salaries or policies or retaining individuals in office, except by consent of the contracting parties. On the whole, such a holding is probably preferable to one which would open the courts to pass on the motives of directors in the lawful exercise of their trust.

A further reason for reversal exists. At the time the contract was made the plaintiff was a City Magistrate. He complains that the defendant Stoneham breached the contract by failure " to use his best endeavors " for the purpose of continuing him as a director and treasurer of the corporation which Stoneham controlled. The plaintiff resigned as City Magistrate after the commencement of this action. He has recovered a judgment for " the amount of the salary of the treasurer of the National Exhibition Company at the rate of $10,000 per year from the second day of May, 1928, to the date of the entry of this decree."

The Inferior Criminal Courts Act (Laws of 1910, ch.

659, as amd.) provides that no " city magistrate shall engage in any other business, profession or hold any other public office or shall serve as the representative of any political party for any assembly, aldermanic, senatorial or congressional district in the executive committee or other governing body of any political party organization or political party association. No city magistrate shall engage in any other business or profession or act as referee, or receiver, but each of said justices and magistrates shall devote his whole time and capacity, so far as the public interest demands, to the duties of his office. * * * " (§ 161, Laws 1933, ch. 746, formerly § 102 as amended, Laws 1915, ch. 531). The contract contemplated that the plaintiff should hold an executive office at a stipulated and substantial salary. The by-laws of the corporation impose upon the treasurer regular duties as the fiscal agent of the corporation and provide in addition that " he shall perform such other duties, as shall be, from time to time assigned to him by the board of directors or the president, or as may be required by these by-laws." If the performance of regular duties in the management of a business corporation for a substantial remuneration does not constitute " engaging in a business " then these words are futile and meaningless. The statute requires that a magistrate shall " devote his whole time and capacity, so far as the public interest demands, to the duties of his office " but it does not, in all cases, leave to the magistrate or to any other court or judge the delicate question of whether the encroachment of other activities upon the time and capacity of the magistrate interferes with the performance of his duty to the public. The statute provides in clear, even if redundant, language, that a magistrate must in the performance of his public duties be free from the rival claims of a business or profession upon his time and capacity. He cannot serve both masters for hire. Though the performance of the duties of public office or the active

practice of a business may leave some leisure for outside activities, the magistrate is prohibited from attempting to make the management of a business an outside activity. Occasional transaction of business, or voluntary assistance rendered in the management of a business, may not violate the statutory command that a magistrate shall devote to the duties of his office " his whole time and capacity, so far as the public interest demands;" the assumption for a substantial salary of important executive office of a corporation with prescribed regular duties in the management of the business does violate the express provision that a magistrate shall not engage in any business.

It is said by counsel that the validity of the agreement rests upon its making, not upon what the plaintiff did afterwards. We are told that the parties did not limit the contract to the time when the plaintiff would also be City Magistrate. He might have resigned before the next annual election of corporate officers, then there would have been no possible claim that in purpose and result the contract constituted a violation of the statute. He did resign before the time of the trial, perhaps to make legal what was theretofore forbidden. Therefore, we are told that at least at the time of the trial the contract was valid and enforceable.

Until the date when the defendants repudiated the agreement, its performance constituted a violation of the statute. Even though we should assume that the contract was not illegal in purpose at its inception, it created a combination which resulted in a succession of illegal acts. The defendants cannot be held in damages for refusal to continue such a combination. The plaintiff can recover no compensation for loss of opportunity to perform services forbidden by law. The circumstance that at the time of the trial performance of such services was no longer illegal does not change the fact that at the time the defendants repudiated the agreement, its performance would have offended the law. The plaintiff could not be

continued as treasurer. The illegality was not tempo-
rary and unexpected. It lasted for a period of years.
Removal of the legal obstacle to the plaintiff's continu-
ance in office came too late after his tenure of office
was terminated.

The judgment of the Appellate Division and that of
the Trial Term should be reversed and the complaint
dismissed, with costs in all courts.

LEHMAN, J. (concurring). I concur in the decision of
the court on the second ground stated in the opinion.
I desire to state the reasons why I do not accept the first
ground.

The defendant Stoneham owned the majority stock of
the corporation and could exercise the control of the
corporation which the holder of the majority stock
possesses. He could choose the directors of the corpora-
tion who in turn would elect the officers and determine the
corporate policies. The agreement between the defendant
Stoneham, the plaintiff, McQuade, and McGraw provided,
in effect, that, in consideration of the sale by Stoneham
of part of his majority stock, the power of control which
Stoneham had previously exercised should be shared with
McQuade and McGraw and, specifically, that mutual
assurance should be given that this power of control
would be used in concert to continue each of the three
parties to the contract as directors and officers of the
corporation at stipulated salaries and to preclude change
without common consent in "matters regarding the
policy of the business of the corporation or any matters
which may in any wise affect, endanger or interfere with
the rights of minority stockholders."

We have said: "An ordinary agreement, among a
minority in number, but a majority in shares, for the
purpose of obtaining control of the corporation by the
election of particular persons as directors is not illegal."
(*Manson* v. *Curtis*, 223 N. Y. 313, 319.) We are agreed
that if the contract had provided only for the election of

directors it would not have been illegal. Its vice, if any, is inherent in the provisions intended to give assurance that the directors so elected would act according to the prearranged design of the stockholders in apportioning the corporate offices and emoluments of such offices among the majority stockholders.

The corporate charter and statutory provisions fix the manner in which the corporate affairs must be conducted. The majority stockholders do not own the corporation nor have they unlimited power of control. Their corporate powers are conferred by the charter and may be exercised only in the field defined by the charter. They act at stockholders' meetings in relation to matters which may be decided at such meetings. There, the directors are chosen by the vote of the holders of a majority of the stock, but the stockholders have no power, except as provided by charter or statute, to divest directors of any of their functions or direct them in the exercise of their functions. The directors are constituted managers of the corporate affairs. They determine the corporate policies, they elect the corporate officers. In the functioning of the corporate machinery the power of control of the holders of the majority stock is, as in such matters, exhausted with the election of the directors. When elected the directors must act in behalf of the corporation, not in behalf of any group of stockholders. It would constitute a wrong to the corporation and its minority stockholders if the directors were permitted to transfer their powers and functions to the holders of a majority of the stock or to bind themselves to accept direction from any persons not vested with power of control by law.

There can, I think, be no doubt that shareholders owning a majority of the corporate stock may combine to obtain and exercise any control which a single owner of such stock could exercise. What may lawfully be done by an individual may ordinarily be lawfully done

by a combination, but no combination is legal if formed to accomplish an illegal object. No such combination or agreement may " contravene any express charter or statutory provision or contemplate any fraud, oppression or wrong against other stockholders or other illegal object." (*Manson* v. *Curtis, supra.*)

In that case we held invalid, on that ground, an agreement for the selection " of directors who should remain passive or mechanical to the will and word " of one of the parties to the agreement. Now it is said that, for the same reason, this agreement must be held unenforceable, though here the agreement contemplated no restriction upon the powers of the board of directors, and no dictation or interference by stockholders except in so far as concerns the election and remuneration of officers and the adhesion by the corporation to established policies.

It seems difficult to reconcile such a decision with the statements in the opinion in *Manson* v. *Curtis* that " it is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a course of corporate policy or action, or upon the *officers* whom they will elect," and that " shareholders have the right to combine their interests and voting powers to secure such control of the corporation and the adoption of and *adhesion* by it to a specific policy and course of business." Obviously a combination intended to effect the election of certain officers and to obtain control of the corporation and adhesion by it to a specific policy and course of business can accomplish its ends only to the extent that directors will bow to the will of those who united to elect them. The directors have the power and the duty to act in accordance with their own best judgment so long as they remain directors. The majority stockholders can compel no action by the directors, but at the expiration of the term of office of the directors the stockholders have the power to replace them with others whose actions coincide with the judgment or

desires of the holders of a majority of the stock. The theory that directors exercise in all matters an independent judgment in practice often yields to the fact that the choice of directors lies with the majority stockholders and thus gives the stockholders a very effective control of the action by the board of directors. In truth the board of directors may check the arbitrary will of those who would otherwise completely control the corporation, but cannot indefinitely thwart their will.

A contract which destroys this check contravenes " express charter or statutory provisions " and is, therefore, illegal. A contract which merely provides that stockholders shall in combination use their power to achieve a legitimate purpose is not illegal. They may join in the election of directors who, in their opinion, will be in sympathy with the policies of the majority stockholders and who, in the choice of executive officers, will be influenced by the wishes of the majority stockholders. The directors so chosen may not act in disregard of the best interests of the corporation and its minority stockholders, but with that limitation they may and, in practice, usually are swayed by the wishes of the majority. Otherwise there would be no continuity of corporate policy and no continuity in management of corporate affairs.

The contract now under consideration provides, in a narrow field, for corporate action within these limitations. Its purpose and intent is to fix the manner in which control vested in the stockholders shall be exercised. It is not designed to create a control which is itself illegal. True it does contemplate that the parties will, as directors, vote to place each other in specified offices. If this represented a corrupt bargain intended to despoil the corporation, it would be an illegal combination, but there is no evidence or finding that it had such purpose or result. Neither the corporation nor any minority stockholders are complaining and the findings establish that

the arrangement resulted in protection which the minority stockholders would not otherwise have had and that it was repudiated by defendant (Stoneham) because such protection proved irksome to him. It does constrain the parties while acting as directors to vote for officers in a predetermined manner, but there is no suggestion that such vote would not accord with their best judgment and be in the interests of the corporation. It is subject to the implied condition that the officers so elected will be loyal to the corporation. (*Fells* v. *Katz*, 256 N. Y. 67.) It binds the directors only in a matter where freedom is a fiction rather than a fact. If this contract is unenforceable and contrary to public policy, then every purchase of a substantial block of stock upon the promise of the majority stockholders that the purchaser will be elected a director and officer of the corporation is likewise against public policy.

We have said: " The law requires of the majority of the stockholders the utmost good faith in their control and management of the corporation as regards the minority, and in this respect the majority stand in much the same attitude towards the minority that the directors sustain towards all the stockholders." (*Farmers L. & T. Co.* v. *New York & Northern Ry. Co.*, 150 N. Y. 410, 430.) The courts should and do enforce the rule of good faith towards all stockholders. No group of stockholders may use their power to wrong others. No director may repudiate his trust to exercise his best judgment. A contract calculated to deprive the corporation and its minority stockholders of statutory safeguards constitutes such a wrong. So, too, does a contract by directors to repudiate their trust. A ˙contract which merely provides for the election of fit officers and adhesion to particular policy determined in advance constitutes an agreement by which men in combination exercise a power which could be lawfully exercised if lodged in a single man. It is legal if designed to protect legitimate interests

without wrong to others. Public policy should be governed by facts, not abstractions. The contract is, in my opinion, valid. It is unenforceable only because it resulted in an employment which was itself illegal.

CRANE, KELLOGG, O'BRIEN and HUBBS, JJ., concur with POUND, Ch. J.; LEHMAN, J., concurs in result in opinion in which CROUCH, J., concurs.

Judgments reversed, etc.