828 F.2d 686
 RICO Bus.Disp.Guide 6768, 4 UCC Rep.Serv.2d 888
 CITIBANK, N.A., Plaintiff-Counterclaim Defendant,
Third-Party Defendant- Appellee,
v.
DATA LEASE FINANCIAL CORPORATION, Defendant-Counterclaim
Plaintiff, Third Party Plaintiff-Appellant,
v.
Joseph STEFAN, Truman A. Skinner, R. Dale Melching, William
A. Krusen, Robert M. Marlin, Andrew Machata,
Edward G. Grafton, MGIC Indemnity
Corporation, Third-Party
Defendants-Appellees.
 No. 86-5324.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 28, 1987.
Rehearings and Rehearings En Banc Denied Nov. 3, 1987.
 
 Robert M. Sondak, Paul, Landy, Beiley & Harper, P.A., Miami, Fla., Larry Klein, Klein & Beranek, West Palm Beach, Fla., for Data Lease Financial Corp.
 Marc Cooper, Cooper, Wolfe & Bolotin, Karen A. Gievers, Anderson, Moss, Russo, Gievers & Cohen, Miami, Fla., Joseph Stefan.
 Joel S. Perwin, Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, Miami, Fla., for Robert Marlin.
 John H. Schulte, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, Miami, Fla., for Citibank, N.A.
 R. Thomas Farrar, Holland & Knight, Miami, Fla., for Joseph Stefan, Truman Skinner, R. Dale Melching, William Krusen, Robert Marlin, Edward Grafton, Andrew Machata and MGIC Indem. Corp.
 Glenn J. Waldman, Sparber, Shevin, Shapo, Heilbronner & Book, Miami, Fla., for First American Bank & Trust.
 Appeal from the United States District Court for the Southern District of Florida.
 Before RONEY, Chief Judge, VANCE, Circuit Judge, and PITTMAN*, Senior District Judge.
 VANCE, Circuit Judge:
 
 
 1
 This case concerns a loan of more than $6.2 million that Data Lease Financial Corporation ("Data Lease") received from Citibank, N.A. ("Citibank"). When Data Lease could not repay this loan, Citibank commenced this action seeking judicial sale and a deficiency judgment. Data Lease asserted affirmative defenses, counterclaims and third party claims based on the alleged mismanagement of the pledged assets. This appeal is from the lower court's entry of summary judgment in favor of Citibank on all claims and counterclaims.
 
 I. Statement of Facts
 
 2
 On April 12, 1973, Citibank loaned $6.2 million to Data Lease. The collateral securing this loan included 870,000 shares--80.2%--of the capital stock of Miami National Bank ("Miami National").[1] The pledge agreement expressly provided that, upon any default by Data Lease, Citibank had the absolute and exclusive right to vote the pledged shares of Miami National. Between April, 1973 and May, 1974, Data Lease borrowed an additional $670,000 from Citibank. Data Lease defaulted on these obligations by failing to make installment payments due July 12, 1974, and subsequently remained in default.
 
 
 3
 In October, 1974, the Supreme Court of Florida ruled that a third entity, Blackhawk Heating & Plumbing Company, Inc. ("Blackhawk"), had properly exercised an option to purchase 217,500 shares of the Miami National stock owned by Data Lease and pledged to Citibank. Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404 (Fla.1974). The Florida Supreme Court reinstated an injunction restraining Data Lease from conveying any of the 870,000 shares of Miami National stock. Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 328 So.2d 825, 826 (Fla.1975). As a result of these rulings, it was impossible to sell the pledged stock without first reaching some accommodation with Blackhawk.
 
 
 4
 In early 1975, bank regulators called into question Miami National's financial soundness and the competence of its management. The Regional Administrator of National Banks notified Miami National's board of directors that he was "shocked and alarmed" at the financial condition of the bank and that "the future well-being of [Miami National] appear[ed] questionable." The Miami National board of directors decided that the chairman of the board, Roy Talmo, could no longer participate in the bank's management. Talmo was also the chairman of Data Lease.
 
 
 5
 On May 16, 1975, five Miami National directors, including Talmo, resigned from the board pursuant to an agreement ("the turnover agreement") embodied in a memorandum of understanding signed by Citibank. Eight other directors, all elected by Data Lease prior to May, 1975, remained on the board. The remaining board members selected third party defendants Joseph Stefan and Truman Skinner to fill vacancies created by the resignations and elected Stefan as president and chairman of the board. Beginning in 1976, Citibank exercised its right under the pledge agreement to vote the Miami National stock it held as collateral. Citibank utilized these rights to reduce the number of directors from eleven to six and then voted the pledged shares to elect the entire board.
 
 
 6
 In December, 1978, Citibank finally settled Blackhawk's claim and, having received no payment from Data Lease, brought this foreclosure action in the district court. On February 29, 1979, the court ordered an emergency judicial sale of the pledged Miami National stock. This sale was held on February 7, 1979, and Citibank purchased the stock for $3 million.[2]
 
 
 7
 Following the sale, the parties filed numerous pleadings and motions. Data Lease alleged twelve affirmative defenses to foreclosure. These defenses were premised upon the 1975 turnover agreement and Citibank's control of the individuals installed on the Miami National board of directors. Data Lease alleged that these individuals brought about a dramatic decline in the value of Miami National stock through their mismanagement.
 
 
 8
 Data Lease also named these individuals as third party defendants in its counterclaim.[3] 3] Count I of the counterclaim alleged conversion of the pledged stock. Specifically, Data Lease claimed that Citibank and the third party defendants misused the pledged property and denied Data Lease access to information concerning their mismanagement. Count II alleged that Citibank fraudulently induced Data Lease to enter the 1975 turnover agreement. Count III alleged that the pledge agreement and the turnover agreement established a bailment relationship between Citibank and Data Lease and further alleged that Citibank and the third party defendants negligently breached their duties with regard to the bailed property.
 
 
 9
 Counts IV and V were grounded in the Uniform Commercial Code ("U.C.C.") and only stated claims against Citibank. Data Lease alleged that Citibank failed to use reasonable care in the custody and preservation of the pledged Miami National stock, in violation of Fla.Stat. Secs. 679.501-.507 and Sec. 671.203.
 
 
 10
 On June 27, 1985, Data Lease amended its counterclaim to add three additional counts. Counts VI and VII alleged that Citibank and third party defendant Stefan had violated the federal RICO statute, 18 U.S.C. Secs. 1961-68 and the Florida RICO statute, Fla.Stat. Secs. 895.01-.09.[4]
 
 
 11
 On January 8, 1986, the district court entered an order granting partial summary judgment to Citibank and the third party defendants on three threshold issues. First, the district court ruled that Data Lease could not hold Citibank vicariously liable for the actions of the third party defendants because the Miami National directors were not in an agency relationship with Citibank. The court also determined that Data Lease had no cause of action against the Miami National directors themselves because such claims could only be brought in a stockholder derivative suit and Data Lease no longer owned Miami National stock. Finally, the district court held that the 1975 turnover agreement was unenforceable and could not be interposed as a defense against foreclosure.
 
 
 12
 In addition to deciding these three threshold issues, the district court held that a five year statute of limitations barred Counts VI and VII, Data Lease's RICO claims.
 
 
 13
 Beginning in February, 1986, the district court entered a series of orders that effectively eliminated the remainder of Data Lease's counterclaims and affirmative defenses. The court granted summary judgment in favor of Citibank on the claims for conversion and negligent bailment, Counts I and III, because its threshold rulings eliminated the Miami National directors as defendants and foreclosed the possibility that Citibank might be liable for the actions of these individuals. In addition, the district court granted summary judgment on the fraud claim, Count II. While noting that Citibank, as pledgee of the Miami National stock, had a duty to physically preserve the stock certificates, the court held that Citibank had no duty to preserve their underlying value. Therefore the court granted summary judgment on the U.C.C. claims, Counts IV and V. The district court similarly rejected the corresponding affirmative defenses, and, on April 9, 1986, the court entered a final judgment of foreclosure for the principal sum of $7,182,373.65 and interest in the amount of $11,182,241.83. We reverse on all counts.
 
 
 14
 II. The Conversion and Negligent Bailment Claims Against
 
 Citibank and the Third Party Defendants
 
 15
 Data Lease alleges that Citibank installed individuals on the Miami National board of directors who interfered with Data Lease's rights in the pledged stock and misused the bank to the point where its resulting deterioration in value amounted to conversion. Data Lease also claims that this mismanagement breached the common law duties a bailee owes a bailor with respect to bailed property. The district court did not reach the merits of these claims.[5] Rather, the court made two threshold rulings that left Data Lease without anyone to sue.
 
 
 16
 First, the court held that Citibank was not liable for the wrongful actions of the third party defendants because they were not the agents of Citibank while acting in their capacity as Miami National directors. Second, the court held that Data Lease did not have a direct cause of action against the third party defendants because any such action would belong to the corporation, rather than an individual shareholder. Since Data Lease had lost ownership of its Miami National stock as a result of the foreclosure sale, Data Lease could no longer bring suit against these defendants derivatively in Miami National's name. We hold that both of these rulings are incorrect.
 
 
 17
 An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency Sec. 1 (1958). The district court concluded that there was no agency relationship between Citibank and the third party defendants because the 1975 turnover agreement between Citibank and Data Lease was illegal. Regardless of the legality of the turnover agreement, however, a relationship did exist between Citibank and the third party defendants. The issue therefore remains whether these individuals were Citibank's agents.
 
 
 18
 It is well settled under Florida law that,
 
 
 19
 [t]he existence of an agency relationship, the nature and extent of the agent's authority, and the inclusion within the scope of that authority of a particular act are ordinarily questions to be determined by the jury or by the trier of facts in accordance with the evidence adduced in the particular case.
 
 
 20
 Financial Fire & Cas. Co. v. Southmost Vegetable Co-op. Ass'n, 212 So.2d 69, 71 (Fla.Dist.Ct.App.1968) (citing American Can Co. v. Horlamus Corp., 341 F.2d 730 (5th Cir.1965)); see also Borg-Warner Leasing v. Doyle Elec. Co., 733 F.2d 833, 836 (11th Cir.1984); Birmingham Fire Ins. Co. of Pa. v. Moss Manufacturing, Inc., 446 So.2d 1142 (Fla.Dist.Ct.App.1984); Scott v. Sun Bank of Volusia County, 408 So.2d 591, 593 (Fla.Dist.Ct.App.1981). Data Lease need not point to an express agreement in order to establish that an agency relationship existed between Citibank and the third party defendants. Harrell v. Branson, 344 So.2d 604, 607 (Fla.Dist.Ct.App.), cert. denied, 353 So.2d 675 (Fla.1977). Rather, the agency relationship may be inferred from circumstantial evidence or implied from a course of dealings. Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., 669 F.2d 1026, 1035 (5th Cir. Unit B 1982); Harrell, 344 So.2d at 607; Lan-Chile Airlines, Inc. v. Rodriguez, 296 So.2d 498, 500 (Fla.Dist.Ct.App.1974), cert. denied, 310 So.2d 305 (Fla.1975). This principle holds true even when the principal and agent deny the relationship. See Cleveland Compania Maritima, S.A. Panama v. Logothetis, 378 So.2d 1336, 1338 (Fla.Dist.Ct.App.1980); McCabe v. Howard, 281 So.2d 362, 363 (Fla.Dist.Ct.App.1973).
 
 
 21
 In determining whether an agency relationship exists between Citibank and the third party defendants, the key issue is control and domination. See Mercury Cab Owners' Ass'n v. Jones, 79 So.2d 782, 784-85 (Fla.1955); Folwell v. Bernard, 477 So.2d 1060, 1063 (Fla.Dist.Ct.App.1985), cert. denied, 486 So.2d 595 (Fla.1986); Sapp v. City of Tallahassee, 348 So.2d 363, 367 (Fla.Dist.Ct.App.), cert. denied, 354 So.2d 985 (Fla.1977); National State Bank of Newark v. Robert Richter Hotel, Inc., 188 So.2d 18, 19 (Fla.Dist.Ct.App.), cert. denied, 194 So.2d 624 (Fla.1966); King v. Young, 107 So.2d 751, 753 (Fla.Dist.Ct.App.1958).[6] In his deposition, Joseph Stefan made the following admission:
 
 
 22
 Q. Did you work for Citibank?
 
 
 23
 A. At the bottom of everything the answer would be yes. They put me there and they took me out.
 
 
 24
 Stefan further testified that he worked in close coordination with Citibank on "major matters", including major changes of policy.[7] Finally, Stefan described his displeasure with Miami National's head of operations and his inability to remove the man from office:
 
 
 25
 Q. Why couldn't you get rid of Mr. Connor?
 
 
 26
 A. He was there at the wishes of Citibank and they would have to remove him.
 
 
 27
 Indeed, the district court found itself bound to observe that,
 
 
 28
 In opposition to the motion [for summary judgment], DATA LEASE has presented deposition testimony and exhibits tending to show that the Third Party Defendants were agents of CITIBANK as they were chosen by Citibank to fill the MNB directorships, and as CITIBANK controlled their activities during their tenure on the board.
 
 
 29
 Yet inexplicably, the court went on to hold as a matter of law that no agency relationship existed and that Citibank could not be vicariously liable for the actions of the third party defendants. This is error. See, e.g., Cirou v. Basler, 432 So.2d 628, 629 (Fla.Dist.Ct.App.1983); McCabe v. Howard, 281 So.2d at 363.[8]
 
 
 30
 A more difficult issue is whether Data Lease has a direct cause of action against members of the Miami National board of directors. It is an established rule that whenever a plaintiff sues in a stockholder capacity for corporate mismanagement, he must bring the suit derivatively in the name of the corporation. See Empire Life Ins. Co. of America v. Valdak Corp., 468 F.2d 330, 335 (5th Cir.1972); Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir.1968).
 
 
 31
 The reason for this rule is that each shareholder suffers relatively in proportion to the number of shares he owns and each will be made whole if the corporation obtains compensation or restitution from the wrongdoer. If each shareholder could sue individually for his losses, the wrongdoer would be subject to "as many suits ... as there were stockholders in the corporation."
 
 
 32
 Empire Life, 468 F.2d at 335 (quoting Sutter v. General Petroleum Corp., 28 Cal.2d 525, 170 P.2d 898 (1946)). In addition, requiring derivative enforcement of claims belonging to the corporation prevents individual shareholders from incurring a benefit at the expense of other, similarly situated shareholders. See Cowin v. Bresler, 741 F.2d 410, 414 (D.C.Cir.1984) (citing 13 W. Fletcher, Cyclopedia of the Law of Private Corporations, Sec. 5915, at 323 (rev. perm. ed. 1980).
 
 
 33
 Thus, the policy supporting the rule forbidding direct shareholder suits against management is most compelling when the plaintiff is similarly situated to other shareholders, suffers the same injury, and retains the same opportunity to be made whole by a corporate recovery from the wrongdoer. See Cowin v. Bresler, 741 F.2d at 414 (quoting Bokat v. Getty Oil Co., 262 A.2d 246, 249 (Del.1970) and Empire Life, 468 F.2d at 335). On the other hand, the logic of the rule is least persuasive when, as in the present case, these circumstances are all absent. Cf. Citizens Nat'l Bank of St. Petersburg v. Peters, 175 So.2d 54, 56 (Fla.Dist.Ct.App.1965) ("a stockholder may bring a suit in his own right to redress an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders").
 
 
 34
 When a shareholder pledges his stock to a pledgee who assumes control of the corporation, he is no longer similarly situated to the other shareholders. While the other shareholders can bail out at will, the pledged stock is held captive to the whims of the pledgee. This is the very situation that arose in Empire Life, where this court noted that the pledgee could "use his position as director and his vote as stockholder intentionally to depreciate the stock of his pledgor held in pledge with the dishonest purpose of acquiring ownership of the stock at forced sale." 468 F.2d at 336. Unlike the remaining shareholders, who may bring a derivative action, the pledgor loses his opportunity to share in a corporate recovery after a foreclosure sale.[9] For these reasons, the Empire Life court held that the pledgee in Empire Life directly injured his pledgor,
 
 
 35
 "and [could not] avoid direct liability to his pledgor for [the injury], by pleading that the means by which he accomplished this wrong and violated his duty as pledgee, involved an injury to the corporation, for which it may also recover damages." [T]he defendant seeks damages as a pledgor. The fact that his pledge is stock and that if the manipulated depreciation of the stock is proven would also give rise to a derivative suit by defendant as stockholder should not foreclose the suit as pledgor. The role of pledgor and stockholder are not identical and defendant may play the part he chooses .... We find that the defendant ... is entitled to bring his claim as individual pledgor.
 
 
 36
 Empire Life, 468 F.2d at 336 (quoting Ritchie v. McMullen, 79 F. 522 (6th Cir.), cert. denied, 168 U.S. 710, 18 S.Ct. 945, 42 L.Ed. 1212 (1897) and citing 12A W. Fletcher, Cyclopedia of the Law of Private Corporations, Sec. 5649, at 413-18) (emphasis in original).
 
 
 37
 The issue in Empire Life was whether the pledgor could proceed directly against the pledgee. The issue in the present case is whether a pledgor can proceed directly against third parties whom the pledgee has installed on a corporation's board of directors. Nevertheless, we think that whenever a pledgee of stock installs its agents on the board of directors, these agents owe the pledgor the same direct duty as the pledgee.[10] This duty arises from the pledge agreement and is independent of the fiduciary duties owed to the pledgor as shareholder. See Cowin v. Bresler, 741 F.2d at 415; Empire Life, 468 F.2d at 335-36.[11] The same policy considerations--the potential for abuse of the collateral, the relative helplessness of the pledgor, and the inadequacy of other remedies--which militate in favor of allowing a direct cause of action against a pledgee, also require us to allow a direct cause of action against the pledgee's agents whom the pledgee has placed in control of the corporation.
 
 
 38
 The district court disposed of the conversion and negligent bailment claims through an incorrect application of the law. Data Lease must have the chance to prove the merits of these claims at trial.
 
 
 39
 III. The Fraud Claims Against Citibank and the Third Party
 
 Defendants
 
 40
 Data Lease claims that Citibank and the third party defendants employed fraudulent statements to deceive Data Lease into entering the 1975 turnover agreement under which Data Lease relinquished control of Miami National. According to the deposition testimony of several witnesses, Citibank promised that it would assist Miami National in obtaining deposits, loans and loan participants, and that Citibank would furnish experts to improve Miami National's performance. Citibank also assured Data Lease that it would select a new management team consisting of experienced and competent managers.[12]
 
 
 41
 Data Lease further claims that the fraud continued once Citibank and the third party defendants gained control of Miami National. These additional misrepresentations took the form of glowing reports concerning the financial condition of Miami National and the competency of its new management team. For example, when Data Lease learned that Miami National had made a disastrous series of loans approximating $5,000,000, a Citibank officer reassured Data Lease that its concerns were overblown. This same officer testified that he had earlier refused to involve Citibank in the same project.
 
 
 42
 I turned it down on both form and substance. This was a project that had a very jaded past, which was sufficient reason to turn it down out of hand. In addition, as has been discussed here, I didn't think the principals were acceptable as borrowers.
 
 
 43
 The Citibank officer placed Data Lease in touch with Truman Skinner, a new Miami National director. Allegedly, Skinner falsely stated that the comptroller of currency had approved the loans and misrepresented Miami National's liability as minimal.
 
 
 44
 Under Florida law, the essential elements of a claim for fraudulent misrepresentation include: 1) a false statement concerning a specific material fact; 2) a showing that the representer knew, or should have known, that the representation was false; 3) an intention that the representation induce another to act on it; and 4) consequent injury to the party acting in justifiable reliance on the representation. Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1103 (11th Cir.1983); Bissett v. Ply-Gem Industries, Inc., 533 F.2d 142, 146 (5th Cir.1976). The district court granted summary judgment for Citibank and the third party defendants because it could discern no injury suffered by Data Lease acting in reliance upon the alleged misrepresentations.
 
 
 45
 The district court reasoned that Citibank, as a secured creditor, could assume all rights to the Miami National stock after default, and could have either taken control of the bank by voting the stock pursuant to the pledge agreement or sold the stock--all without the consent of Data Lease. As a result, the district court concluded that Data Lease gave up nothing when it allowed Citibank and the third party defendants to assume control of Miami National.
 
 
 46
 Data Lease, however, has adduced evidence to the contrary. Citibank apprehended great difficulties in foreclosing on the Miami National stock because the Florida Supreme Court had reinstated an injunction restraining Data Lease from conveying any of its Miami National shares. See Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp., 328 So.2d 825 (Fla.1975). Citibank's counsel advised that a foreclosure sale could render Data Lease insolvent and force it to seek the protection of a bankruptcy court. In an internal memorandum dated March 31, 1975, a Citibank vice president concluded:
 
 
 47
 Given the summary of alternatives on the disposition of our loan by Shearman & Sterling it seems that both Alternative I-Voluntary Sale of Miami National Bank and Alternative II-Citibank foreclosure on MNB and subsequent sale, appear to contain significant problem areas, (the injunction and Data Lease Bankruptcy) which preclude our following these alternatives.
 
 
 48
 The memo went on to propose that Citibank offer Data Lease time and cooperation in exchange for placing new management in the bank so the stock could be sold for a higher value at a later date.
 
 
 49
 Citibank also concluded that it would be unable to assume control by voting the stock at the March 21, 1975 stockholders meeting. In his deposition, Citibank's counsel John Roche explained:
 
 
 50
 I was always concerned, because of the Bank Holding Company Act, that Citibank should not take control of the Miami National Bank, and took some care in the [turnover agreement] to see that it did not take control within the meaning of the act.... I think [operational control, day-to-day management] was rejected and instead the solution was a voluntary change in some of the directors and the CEO of MNB, acceptable to the board, with the retention of directors from the old slate and without putting in Citibank people into MNB.
 
 
 51
 * * *
 
 
 52
 * * *Q. What was the problem with the Bank Holding Company Act with Citibank taking control?
 
 
 53
 A. At the time, the statute provided a two-year period for the acquisition of stock or control, and after that two-year period, there would have to be divestiture of the stock or relinquishment of control within the meaning of the act. I didn't want the period to begin running.
 
 
 54
 Q. Why?
 
 
 55
 A. Because in discussions with the business people, it looked as if it would take a longer period of time to work out the problems. Miami National Bank was a very, very sick bank.
 
 
 56
 This deposition testimony along with other evidence indicated that, at least in 1975, Citibank believed that it could not accomplish its objectives without Data Lease's cooperation.
 
 
 57
 Citibank bargained hard for this cooperation.[13] The district court nevertheless concluded that Data Lease took no action that it was not already obligated to take under the terms of the pledge agreement and thus could not recover against Citibank. See, e.g., Betterton v. First Interstate Bank of Arizona, N.A., 615 F.Supp. 72, 74 (E.D.Mo.1985) ("no recovery in fraud for a deception by which a person is induced to do something which he is already bound to do"), rev'd on other grounds, 800 F.2d 732 (8th Cir.1986). This conclusion is erroneous. The evidence suggests that Citibank induced Data Lease to participate in a plan where Data Lease would retain ownership and ostensible control of Miami National while Citibank called the shots in the background. The pledge agreement did not contemplate such an arrangement; only by gaining Data Lease's consent to the turnover agreement could Citibank be assured of firm control.
 
 
 58
 The district court was also wrong to conclude, as a matter of law, that Data Lease suffered no injury as a result of its participation in this arrangement. The resulting change in management was catastrophic for Miami National, with the value of the pledged stock declining dramatically. It is true that Citibank could have taken control of the bank without Data Lease's consent and that Data Lease may have suffered the same injury even if it had refused its cooperation. On the other hand, there is evidence that Citibank had temporarily abandoned this option. Indeed, Citibank did not begin exercising its voting rights to the pledged shares until September, 1976. A jury could conclude that, but for Data Lease's cooperation with Citibank, Miami National would have been spared at least one year of the mismanagement that occurred under Citibank's tutelage.
 
 
 59
 It is irrelevant whether Citibank and its counsel correctly analyzed the law or whether Citibank had additional options which it failed to consider. If Citibank would not have assumed control of Miami National without the cooperation of Data Lease, this cooperation constitutes detrimental reliance. Data Lease is entitled to prove at trial that Citibank obtained this cooperation by fraudulent misrepresentations.[14]
 
 IV. The U.C.C. Claims Against Citibank
 
 60
 Section 9-207 of the Uniform Commercial Code specifies a pledgee's duties with respect to the pledged collateral. Section 679.207(1), Florida Statutes, provides:
 
 
 61
 A secured party must use reasonable care in the custody and preservation of collateral in his possession.
 
 
 62
 This duty applies "when the secured party has possession of the collateral before default, as a pledgee, and also when he has taken possession of the collateral after default." U.C.C. Sec. 9-207 comment 4; see also Fla.Stat. Sec. 679.501(2). A secured party is liable for any loss caused by his failure to meet this standard of care. Fla.Stat. Sec. 679.207(3).[15]
 
 
 63
 The district court held that Citibank had discharged this duty of reasonable care because Citibank "physically preserved" the paper certificates representing Miami National stock. Indeed, the general rule is that,
 
 
 64
 a pledgee's duty with regards to the care of the pledged chattel is confined solely to the physical care of the chattel and a pledgee is not liable for a decline in the value of pledged instruments.
 
 
 65
 See Tepper v. Chase Manhattan Bank, N.A., 376 So.2d 35, 36 (Fla.Dist.Ct.App.1979). This rule is based on the common sense notion that a pledgee who has no control over a corporation cannot be held responsible for a dip in the price of stock.
 
 
 66
 For this reason, the law makes an exception when the pledged stock represents a controlling interest and the pledgee becomes involved in the management of the company. See Empire Life, 468 F.2d at 335. As the pledgee enters this new arena, its duty of reasonable care follows it and attaches to all its activities. Id. In the present case, Data Lease has adduced evidence that Citibank used its power as controlling shareholder to install and maintain incompetent individuals in positions of management at Miami National. Additional evidence suggests that Citibank blithely allowed these individuals to deplete the value of the pledged collateral. We conclude that a jury could find that these actions constituted a breach of Citibank's statutory duty of reasonable care.[16]
 
 V. The RICO claims
 
 67
 In 1985, the district court allowed Data Lease to amend its counterclaim and third party complaint so as to allege violations of federal and Florida RICO laws. On motion for summary judgment, the court noted that all of the actions giving rise to the RICO claims occurred while Stefan was chairman of the Miami National board of directors, a position he held until 1978. Thus, the relevant statute of limitations had expired. See Fla.Stat. Sec. 895.05(10); Agency Holding Corp. v. Malley-Duff & Assoc., --- U.S. ----, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The court held that the RICO claims would not relate back because they were based on new facts. This conclusion is erroneous.
 
 
 68
 Fed.R.Civ.P. 15(c) governs the relation back of amendments to pleadings. This rule provides:
 
 
 69
 Whenever the claim or defense asserted in the amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.
 
 
 70
 Counts VI and VII alleged that Citibank and Stefan engaged in a pattern of racketeering activity through which they acquired and maintained control of Miami National and manipulated the conduct of the bank's affairs. These claims are grounded on Citibank's misrepresentations to Data Lease and communications to Miami National urging that significant sums of money be loaned to questionable people for dubious projects. These additional allegations of mail and wire fraud are therefore based substantially on the same conduct set forth in the previous pleadings.
 
 
 71
 Nevertheless, Citibank argues that the additional claims do not relate back because the original complaint did not specifically allege criminal activity. We disagree. We can find no reason to enforce a statute of limitations when the respondents had notice from the beginning that Data Lease would be trying to enforce claims arising from this course of conduct. See Tiller v. Atlantic Coast Line R. Co., 323 U.S. 574, 581, 65 S.Ct. 421, 424, 89 L.Ed. 465 (1945). We conclude that the effect of the amendment to the pleadings was "to facilitate a fair trial of the existing issues." Id.[17]
 
 VI. The Affirmative Defenses
 
 72
 Data Lease's thesis is that the parties substituted a new contract for the original pledge agreement and that this new contract was the 1975 turnover agreement.[18] Several of Data Lease's affirmative defenses center on allegations that Citibank breached or waived the provisions of this new agreement. In addition, Data Lease asserts traditional equitable defenses to specific performance.
 
 
 73
 The turnover agreement is evidenced in part by a memorandum of understanding executed by Data Lease and Citibank on April 22, 1975. In this document, Data Lease and Roy Talmo agreed upon a procedure for replacing a majority of the Miami National board of directors with individuals "acceptable to Citibank." The memorandum further provided that Stefan would replace Talmo as director, chairman of the board, and president. In its counterclaim, Data Lease characterizes the turnover agreement as a contract under which "Citibank took control of and undertook to manage the business affairs of Miami National Bank." The counterclaim further alleges that Citibank represented that it would "select, install, oversee and supervise" Stefan and other Miami National personnel.
 
 
 74
 The district court reasoned that the turnover agreement was illegal because it had the effect of withdrawing from the board of directors control and direction over the corporate affairs of Miami National. As support for this proposition, the court relied upon the landmark case of Manson v. Curtis, 223 N.Y. 313, 119 N.E. 559 (1918). The Manson court described the relationship between shareholders and directors as follows:
 
 
 75
 As a general rule, the stockholders cannot act in relation to the ordinary business of the corporation, nor can they control the directors in the exercise of the judgment vested in them by virtue of their office.... Directors are the exclusive, executive representatives of the corporation, and are charged with administration of its internal affairs and the management and use of its assets. Clearly the law does not permit the stockholders to create a sterilized board of directors.
 
 
 76
 119 N.E. at 562 (citations omitted); see also McQuade v. Stoneham, 263 N.Y. 323, 189 N.E. 234, 236 (1934) ("Directors may not by agreements entered into as stockholders abrogate their independent judgment"); cf. 12 U.S.C. Secs. 24, 71 (National Bank Act entrusts the board of directors with the care and management of the bank's affairs). Accordingly, the district court correctly concluded that a Florida court applying Manson could find the 1975 turnover agreement illegal if it allowed Citibank to direct the day-to-day actions of the board of directors with respect to the ordinary business of the corporation.
 
 
 77
 At this stage of the proceedings, however, the terms of the turnover agreement are far from certain. The memorandum of understanding indicates that the purpose of the turnover agreement was to replace the old board of directors, rather than to sterilize the new board. Indeed, Manson explicitly approves of this type of agreement:
 
 
 78
 It is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a course of corporate policy or action, or upon the officers whom they will elect. An ordinary agreement, among a minority in number, but a majority in shares, for the purpose of obtaining control of the corporation by the election of particular persons as directors is not illegal. Shareholders have the right to combine their interests and voting powers to secure such control of the corporation and the adoption of and adhesion by it to specific policy and course of business.
 
 
 79
 119 N.E. at 561; see also McQuade v. Stoneham, 189 N.E. at 236 ("Stockholders may, of course, combine to elect directors"); see also Glekel v. Gluck, 30 N.Y.2d 93, 330 N.Y.S.2d 371, 372-75, 281 N.E.2d 171, 172-73 (1972) (reaffirming that stockholders can agree to control corporate policy as long as they do not "interfere directly with the normal freedom of management of the corporation by its directors and officers").
 
 
 80
 Because of the uncertainties of fact and law attending this issue, we think it inappropriate to determine the legality of the turnover agreement on a motion for summary judgment.
 
 
 81
 We also reject Citibank's contention that Data Lease's participation in the turnover agreement prevents Data Lease from seeking equitable relief. Even assuming that there are aspects of the agreement that run counter to public policy, the resulting illegality falls far short of the wrongful conduct necessary to taint Data Lease with unclean hands. Cf. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 819, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945) (unclean hands doctrine justifies dismissal where "inequitable conduct impregnates ... entire cause of action"); Hensel v. Aurilio, 417 So.2d 1035, 1038 (Fla.Dist.Ct.App.1982) (equating unclean hands with "unscrupulous practices, overreaching, concealment, trickery, [and] other unconscientous conduct condemned by honest and reasonable men").
 
 
 82
 REVERSED and REMANDED.
 
 
 
 *
 Hon. Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 The collateral also included 35,138 shares of First American Bank & Trust which are not relevant to our discussion of the issues in this case
 
 
 [2]
 The order confirming this purchase was appealed and affirmed. Citibank, N.A. v. Data Lease Financial Corp., 645 F.2d 333 (5th Cir.1981)
 
 
 [3]
 The individuals named as third party defendants are Stefan, Skinner, Robert Marlin, Dale Melching, Andrew Machata, Edward Grafton, and William Krusen
 
 
 [4]
 An additional claim, Count VIII, alleged that Citibank and third party defendants Stefan and Skinner had violated the Florida civil theft statute, Fla.Stat. Sec. 812.014, by backdating the registration of the pledged Miami National stock. The district court dismissed this count under the doctrine of collateral estoppel after finding that the issue had been extensively litigated in the Florida state courts. See Citibank N.A. v. Data Lease Fin. Corp., 478 So.2d 76 (Fla.Dist.Ct.App.1985); Blackhawk Heating and Plumbing Co. v. Data Lease Fin. Corp., 446 So.2d 127 (Fla.Dist.Ct.App.1983). On appeal, Data Lease has not addressed the district court's disposition of its civil theft claim and has thus abandoned Count VIII
 
 
 [5]
 The district court also held that Data Lease's common law claim of negligent bailment, as alleged in Count III, was superseded by the more specific U.C.C. remedy sought under Count IV. Our disposition of Data Lease's U.C.C. claims would appear to diminish the significance of this issue to the outcome of the present lawsuit. For the present, we leave this question open because of its potential importance and because the parties have inadequately briefed the subject. No cases have been brought to our attention indicating how a Florida court would dispose of this issue
 
 
 [6]
 "[C]ontrol and domination need not be actual but may be binding upon the principal if apparent." Sapp v. City of Tallahassee, 348 So.2d 363, 367 (Fla.Dist.Ct.App.), cert. denied, 354 So.2d 985 (Fla.1977); cf. Seaboard Properties, Inc. v. Bunchman, 278 F.2d 679, 682 (5th Cir.1960) ("authority of the agent may be real or apparent"); Taco Bell of California v. Zappone, 324 So.2d 121, 123 (Fla.Dist.Ct.App.1975). If the purported principal represents to a third person that an agency relationship exists and the third person relies upon this relationship to his detriment, then the principal is estopped from denying the agency relationship. See, e.g., Borg-Warner Leasing v. Doyle Elec. Co., 733 F.2d 833, 836 (11th Cir.1984); Orlando Executive Park, Inc. v. Robbins, 433 So.2d 491, 494 (Fla.1983); Mercury Cab Owners' Ass'n v. Jones, 79 So.2d 782, 784 (Fla.1955); Sapp v. City of Tallahassee, 348 So.2d at 367; Restatement (Second) of Agency Sec. 8B (1958). On the other hand, it is important to remember that this doctrine "rests on appearances created by the principal and not agents who often ingeniously create an appearance of authority by their own acts." Smith v. American Auto. Ins. Co., 498 So.2d 448, 449 (Fla.Dist.Ct.App.1986) (quoting Taco Bell v. Zappone, 324 So.2d 121, 124 (Fla.Dist.Ct.App.1975))
 In the present case, the counterclaim alleges that Citibank agreed in the 1975 turnover agreement that it would "select, install, oversee, and supervise" Stefan and the other third party defendants. Regardless of the agreement's legality, a jury could find that its terms are additional evidence of Citibank's actual or apparent control over the third party defendants.
 
 
 [7]
 A common purpose or design may constitute additional evidence of agency. See McCabe v. Howard, 281 So.2d 362, 363 (Fla.Dist.Ct.App.1973)
 
 
 [8]
 Data Lease must also convince the trier of fact that the acts of which it complains were within the scope of the agency relationship. See Hudak v. Economic Research Analysts, Inc., 499 F.2d 996, 1002 (5th Cir.1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975); Cirou v. Basler, 432 So.2d 628, 629 (Fla.Dist.Ct.App.1983)
 
 
 [9]
 A shareholder may not bring a derivative action once he parts with his shares. See Schilling v. Belcher, 582 F.2d 995, 1001-02 (5th Cir.1978). As a general rule, the shareholder also does not have a direct cause of action:
 [W]e have specifically ruled that a stockholder cannot recover for a personal loss by asserting and proving that the defendants' wrongdoing has caused him to sell his corporate stock at a depressed value, for by the very act of selling at a lower price he has established that the direct damage was to corporate worth. The loss in his stock's sale price is a real economic harm to him, but is both indirect to and duplicative of the corporation's right of action.
 Mendenhall v. Fleming Co., 504 F.2d 879, 881 (5th Cir.1974); see also Martens v. Barrett, 245 F.2d 844 (5th Cir.1957); Peter v. Western Newspaper Union, 200 F.2d 867 (5th Cir.1953).
 
 
 [10]
 The lower court refused to find such a duty because of the general rule to the contrary:
 An agent who intentionally or negligently fails to perform duties to his principal is not thereby liable to a person whose economic interests are thereby harmed.
 Restatement (Second) of Agency Sec. 357 (1958); see also Suzuki v. Gateway Realty of America, 207 Neb. 562, 299 N.W.2d 762, 766 (1980); Bescor, Inc. v. Chicago Title & Trust Co., 113 Ill.App.3d 65, 68 Ill.Dec. 812, 815, 446 N.E.2d 1209, 1212 (1983); Merriman v. Smith, 599 S.W.2d 548 (Tenn.Ct.App.1979).
 This rule, however, has not prevented the Florida courts from extending an agent's duty from his principal to a third party where circumstances warrant. See, e.g., First American Title Ins. Co. v. First Title Service Co., 457 So.2d 467, 473 (Fla.1984) ("Where the abstracter knows, or should know, that his customer wants the abstract for the use of a prospective purchaser, and the prospect purchases the land relying on the abstract, the abstracter's duty of care runs ... not only to his customer but to the purchaser"); Robinson v. John E. Hunt & Assoc., 490 So.2d 1291, 1293 (Fla.Dist.Ct.App.1986) (injured party may sue tortfeaser's insurance agent for negligence in failing to provide adequate insurance to the tortfeaser).
 
 
 [11]
 Our result is therefore consistent with the case law in this circuit holding that a shareholder need not assert his rights through the corporation if he can show the violation of a duty owed directly to him. Empire Life, 468 F.2d at 335; Stevens v. Lowder, 643 F.2d 1078, 1080 (5th Cir. Unit B 1981); Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir.1968); see also Cowin v. Bresler, 741 F.2d at 415; Buschmann v. Professional Men's Ass'n, 405 F.2d 659, 662 (7th Cir.1969); Eden v. Miller, 37 F.2d 8 (2d Cir.1930)
 
 
 [12]
 Citibank claims that a promise to do something in the future cannot support an action for fraud. Florida law, however, treats a promissor's intent as a material existing fact. See Bissett v. Ply-Gem Industries, 533 F.2d 142, 145 (5th Cir.1976). Accordingly, Data Lease may recover for such a misrepresentation if it shows that the promisor either lacked the intention to perform the promise or specifically intended not to perform at the time the representation was made. Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1104 (11th Cir.1983); Bissett, 533 F.2d at 145; Alexander/Davis Properties, Inc. v. Graham, 397 So.2d 699, 706 (Fla.Dist.Ct.App.), cert. denied, 408 So.2d 1093 (Fla.1981)
 
 
 [13]
 Stefan gave the following testimony concerning an extensive series of discussions between Citibank and Data Lease:
 Q. And did you hear any statements made to Mr. Talmo by way of leaning on him to agree to step down in your favor?
 A. I did get that impression.
 * * *
 Q. What type of leaning did [Mr. Roche] do at that meeting?
 A. Generalization that there would be consequences if this fine course of action that they were describing were not implemented.
 Q. What type of consequences did he allude to?
 A. I can't say specifically, but they were not the kind of things that would be pleasing to Data Lease.
 Q. Did you come away from that meeting with the impression that Mr. Roche and Mr. Mapel were conveying to Mr. Talmo that the full weight of the institution, of Citibank, was leaning on Mr. Talmo?
 A. Mr. Sondak, that would be overbearing. If you put the whole weight of Citibank on Mr. Talmo he would become a beetle.
 Q. How much pressure would you say Mr. Mapel and Mr. Roche applied to Mr. Talmo?
 A. Just enough to accomplish their purpose.
 
 
 [14]
 A jury could also find that the misrepresentations continued once Citibank and the third party defendants assumed control of Miami National and that Data Lease detrimentally relied on these additional representations. A Data Lease officer gave the following testimony at deposition:
 I think our problem was if the misrepresentation caused us not to take action, if the--if [Skinner] would have told us the truth at the time, there were many things that we could have done then rather than later. I think we eventually did file a mismanagement suit in Palm Beach County but by that time it was maybe Fall of 1978....
 
 
 [15]
 Count IV alleges a breach of Citibank's duties under Fla.Stat. Sec. 679.207. Count V alleges a breach of the duty to act in a commercially reasonable manner, Fla.Stat. Secs. 679.501-.507, and a breach of the covenant of good faith which the U.C.C. imposes on all contracts, Fla.Stat. Sec. 671.203
 
 
 [16]
 Data Lease also argues that Citibank breached its duty of good faith by holding the pledged collateral for an unreasonable period of time without electing between sale and retention. We agree that it is unfair for a creditor "to deprive the debtor of the possession and use of the collateral for an unreasonable length of time and not apply the asset or the proceeds from its sale toward liquidation of the debt." Ayares-Eisenberg Perrine Datsun, Inc. v. Sun Bank of Miami, 455 So.2d 525, 528 (Fla.Dist.Ct.App.1984). This is also a question for the jury
 
 
 [17]
 One fact not previously alleged is the criminal conviction of Stefan for these activities. At the time the amended pleading was filed, it was the law in the Southern District of Florida that a necessary element of a RICO cause of action was a prior criminal conviction. See, e.g., Atlantic Federal Savings & Loan of Ft. Lauderdale v. Dade Savings & Loan Ass'n, 592 F.Supp. 1089, 1093 (S.D.Fla.1984). The Supreme Court has recently held that a prior criminal conviction is not an element of a RICO claim. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985)
 
 
 [18]
 Data Lease also argues that there was an accord and satisfaction of the original debt when it surrendered control of Miami National