(No. 61427.—

SAM C. SEXTON *et al.*, Appellees, v. ROBERT F. SMITH, Appellant.

*Opinion filed April 4, 1986.—Rehearing denied June 2, 1986.*

■■■ ■■■■■■■■

Joe Dees, of Burnside, Dees, Johnston & Choisser, of Vandalia, and Thomas Meyer, of Meyer & Meyer, of Greenville, for appellant.

Jim D. Keehner, of Belleville, for appellees.

JUSTICE WARD delivered the opinion of the court:

The plaintiffs, Sam and Frances Sexton, filed a complaint for legal malpractice in the circuit court of Bond County against the defendant, Robert Smith. Following a bench trial, the court entered judgment in favor of the plaintiffs for $42,130. On the defendant's appeal, the appellate court, with one judge dissenting, entered a Rule 23 order (87 Ill. 2d R. 23) affirming the trial court's judgment. (129 Ill. App. 3d 1168.) We granted the defendant's petition for leave to appeal (94 Ill. 2d R. 315).

Sam Sexton testified that Jeffrey Hampton visited the Sexton farm in mid-August 1976 and told him that Roger Riedemann, the president of the Bradford National Bank in Greenville, had told him that the Sexton farm was for sale. Sexton and Hampton agreed to terms for the sale of the 161-acre farm and the cattle and machinery on it and, according to Hampton, Sexton and he went to Riedemann's office in late August to discuss the financing. Riedemann told them that financing for the

sale of the cattle and machinery would be available if the Sextons and Hamptons between themselves would arrange for the financing of the sale of the farm. Riedemann testified that he told them that the bank "would have to have proper security." On August 31, 1976, Hampton and Sexton went to the defendant's office, where, representing Sexton, he prepared a contract, deed and escrow agreement for the sale of the property. The contract provided for a $50,000 down payment by Jeffrey and Karen Hampton, and the balance was payable in installments over a 25-year period. It was agreed that title was to remain with the Sextons until the completion of payments. The contract, which was dated September 1, 1976, provided that the Hamptons would take possession of the property as of that date and commence farm operations. It does not appear from the record that there was any discussion of the Sextons' retaining a security interest in the cattle and machinery.

On September 27, Hampton delivered a check for $50,000 to Sexton, and the two then went to the Bradford National Bank. Sexton deposited the check in an account he and his wife maintained, and Hampton obtained a loan of $44,600. Hampton and his wife signed a note, a security agreement, and a financing statement giving the bank, under the Uniform Commercial Code (U.C.C.), a first lien on the cattle and machinery. The contract, deed and escrow agreement were not delivered to the bank until sometime after the loan had been made.

It appears from the record that the Hamptons subsequently defaulted on the note and that the bank brought suit, naming apparently both the Hamptons and Sextons, to enforce its lien. Judgment was entered in favor of the bank. The proceeds of the sale of the personalty was not sufficient to satisfy the Hamptons' obligation to the bank.

In testifying, Sam Sexton acknowledged that he knew

Hampton would be obtaining financing from the bank in order to purchase the cattle and machinery. He said, too, that although he alone had negotiated and acted to complete the sale, he had been authorized by his wife to do so.

Hampton testified that in late August he and Sexton talked with Riedemann regarding financing the purchase of the cattle and the machinery. At that time, Riedemann told Sexton that the bank would finance the purchase of the cattle and machinery if Sexton would finance the sale of the farm. Hampton testified that Sexton said that "he could handle that without any problem" and that the next thing to do would be to secure the services of a lawyer. He stated that nothing was said about the Sextons' retaining title to the chattels.

Hampton said that on September 27 in Riedemann's office, he gave the banker an inventory of the cattle and machinery and that, in Sexton's and his presence, Riedemann gave the inventory to his secretary to prepare a note, security agreement, and U.C.C. financing statement. At that time Riedemann stated that he was making the loan to allow Hampton to purchase the cattle and machinery. Hampton testified that Riedemann said that the bank was to have a lien on that property and that Sexton was to finance the farm. Hampton said that Sexton did not comment or object. Hampton testified that when Riedemann asked Sexton if it would be necessary for Sexton to sign a waiver of any prior interest, Sexton replied that it would be unnecessary since it was a "gentleman's agreement," and "it was understood that the bank had a lien on the cattle and the machinery."

The defendant testified that when Sexton was in his office on August 31 he told him that an inventory of the cattle and machinery had been given to the bank. The defendant had the impression that the bank was to act only as escrow agent, he testified, and he was unaware

of the bank's financing role until, over a year later, the bank enforced its security interest. At that time, Sexton told the defendant that he allowed the bank to have a lien on the cattle and machinery since the bank would not make the loan without security.

Riedemann testified that, when Hampton and Sexton were in his office two to four weeks prior to making the loan, he told Hampton that the bank would lend him the money if proper security were provided; the security suggested was the cattle and machinery. The testimony of Riedemann as to what occurred in his office on September 27 was substantially the same as Hampton's. Riedemann, however, did not testify that he asked Sexton whether it would be necessary for Sexton to sign a waiver and that Sexton replied that it would not be necessary.

Vicky Unger, a friend and neighbor of the Sextons and a former secretary of Smith, testified that during her employment with Smith she overheard a conversation between Smith, Sexton and Riedemann. She stated she heard Smith say that the bank should not have taken a first lien on the cattle and machinery without Sam Sexton's consent. Both Smith and Riedemann denied the conversation.

Martin Corbell, an attorney, was called as an expert witness by the plaintiffs. He testified that the only "safe way" to protect and perfect a security interest in personal property is to file a financing statement pursuant to provisions in the U.C.C. If the debtor-buyer has possession of the property, the filing of a financing statement is a necessity, he said.

The trial court held that the defendant was negligent in failing to file a financing statement to perfect a security interest in the chattels in favor of the plaintiffs, as he knew that the Hamptons, who were in possession of the property, could cause a security interest to be per-

fected in favor of the bank. The court found that the plaintiffs did not agree to the bank's taking a prior security interest in the chattels; thus, the defendant's negligence caused the plaintiffs' loss of a secured interest. As stated, a divided panel of the appellate court affirmed.

In an action for legal malpractice the plaintiff must prove that the defendant attorney owed plaintiff a duty of due care arising from the attorney-client relationship, that the defendant breached that duty, and that as a proximate result, the plaintiff suffered injury. (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 18; *Cook v. Gould* (1982), 109 Ill. App. 3d 311, 314; *Brown v. Gitlin* (1974), 19 Ill. App. 3d 1018, 1020.) Only when an attorney fails to exercise a reasonable degree of professional care and skill will he be liable to his client. *Stevens v. Walker & Dexter* (1870), 55 Ill. 151, 152; *Bronstein v. Kalcheim & Kalcheim Ltd.* (1980), 90 Ill. App. 3d 957, 959.

The defendant contends that the trial court's findings that he was negligent and that the negligence was the proximate cause of the plaintiffs' damages are contrary to the manifest weight of the evidence. Any damages to the plaintiffs resulted from their consent to the bank's acquiring a first lien on the cattle and machinery.

Article 9 of the Uniform Commercial Code in part provides for the creation of security interests in personal property or fixtures. (Ill. Rev. Stat. 1983, ch. 26, par. 9—102(1).) The article is designed to protect, through the filing of a financing statement, a creditor's interest in the secured property, as well as to place others on notice of that interest and of possible claims against the property.

The defendant argues that the plaintiffs waived their rights to a security interest in the cattle and machinery. Waiver has been described as an "intentional relinquishment of a known right." (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 499; *Vermilion*

*County Production Credit Association v. Izzard* (1969), 111 Ill. App. 2d 190, 195.) It may be express or implied, and arise from acts, words or conduct of the one waiving the right. *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 499.

It is axiomatic that this court will not disturb a trial court's finding unless that finding is contrary to the manifest weight of the evidence. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110, citing *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356.) We will not overturn a finding simply because we do not agree with it or because we might have reached a different conclusion had we been the trier of fact. *Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110.

On this record we must conclude that the trial court's finding was contrary to the manifest weight of the evidence. Prior to the sale, Sexton knew that Hampton was obtaining financing from the bank for the purchase of the chattels and that the loan would not be made without a security provision for the bank. Hampton testified that, both before the loan and on the day it was made, Sexton agreed that the bank would have a lien on the cattle and machinery. Riedemann and Hampton testified that, when they and Sexton were in Riedemann's office, Riedemann gave an itemized list of the cattle and machinery to his secretary, instructing her to prepare the note and the U.C.C. financing statement. When they were prepared, Hampton signed the documents in Sexton's presence. He and Riedemann testified that at no time did Sexton object or comment. When Sexton testified, he had opportunity to contradict; he did not do so. Hampton further testified that when Riedemann asked if it would be necessary for Sexton to sign a waiver of any priority claim in the chattels, Sexton replied that it was unnecessary and that he understood the bank would have a first lien. Again, there was no denial by Sexton.

Smith testified that in late 1977 Sexton came to his office and told him that Riedemann claimed the bank had a lien on the cattle and machinery. Sexton told him that in response to Riedemann's inquiry to Sexton whether he "could let" the bank have a lien on the cattle and machinery to secure the Hampton's loan, he had said, "well, I guess I could." Sexton further told the defendant that Riedemann said the bank could not make the loan unless the bank had a "first lien on the cattle and machinery." Again, there was no denial by Sexton. The somewhat ambiguous testimony of Vicky Unger is without real significance on this record. She testified to overhearing a conversation between Sexton, Riedemann and Smith at which, she said, Smith stated that the bank should not have taken the property without Sexton's consent. Sexton did not testify that Smith made the statement. Riedemann and Smith denied there was such a statement.

We consider that the evidence showed that Sexton waived any prior security interest in the cattle and machinery in favor of the bank. Any damage to the Sextons was caused by Sexton's waiver of his interest and his assent to the bank's priority. Having voluntarily agreed to the bank's acquiring a preferred claim, Sexton cannot complain that the defendant did not act to protect the interest that he surrendered.

The plaintiffs argue, and the appellate court held, that the absence of Sexton's signature on the financing statement and security agreement is strong evidence that Sexton did not waive his security interest in the cattle and machinery. He contends that a third-party owner of the collateral must sign the security agreement and financing statement, not only for protection of the third party's creditors, but because it is required by section 9—105(1)(d) of the U.C.C. Ill. Ann. Stat., ch. 26, par. 9—112, Illinois Code Comment, at 91 (Smith-Hurd 1974);

Ill. Rev. Stat. 1983, ch. 26, par. 9—105(1)(d).

The appellate court's interpretation that the statute requires the signature of one in the position of the plaintiffs here may be questioned (see Ill. Ann. Stat., ch. 26, par. 9—112, Illinois Code Comment, at 91 (Smith-Hurd 1974)), but that question need not be resolved here. The evidence of waiver we have described convincingly shows that Sexton waived his security interest in favor of the bank.

For the reasons given, the judgments of the appellate and circuit courts are reversed.

*Judgments reversed.*