**WIEBOLDT STORES, INC., By and Through its Trustee in bankruptcy, Thomas E. RALEIGH, Plaintiff,**

**v.**

**Jerome M. SCHOTTENSTEIN, et al., Defendants.**

**No. 87 C 8111.**

United States District Court, N.D. Illinois, E.D.

Sept. 16, 1991.

---

Clifford Gary Kosoff, John Francis Hennessy, Jr., James E. O'Halloran, O'Halloran, Kosoff & Miller, P.C., Northbrook, Ill., for Estate of David C. Keller.

David Bodiker, Bodiker & Holland, Columbus, Ohio, for Estate of Alvin Schottenstein.

Sarah R. Wolff, M. Marshall Seeder, Sachnoff & Weaver, Ltd., Chicago, Ill., for plaintiff Wieboldt Stores Inc.

Barry A. Pitler, Sigi Offenbach, Pitler & Mandell, Chicago, Ill., Peter A. Spaeth, John G. Fabiano, James D. St. Clair, Hale and Dorr, Boston, Mass., for defendants Ari Desche, Jon Diamond, Irving Harris, George Kolber, Thomas Keteler, Jerome M. Schottenstein, Schottenstein Stores Corp., Geraldine Schottenstein, Jay L. Schottenstein, Susan Schottenstein, Ann Schottenstein and Saul Schottenstein.

John G. Jacobs, Robert Plotkin, Jonah Orlofsky, Plotkin & Jacobs, Ltd., Jeffrey Grant Brown, Law Office of Thomas J. Shannon, Ltd., Chicago, Ill., Joel M. Wolosky, Laura I. More, Parker, Chapin, Flattau & Klimpl, New York City, for defendants Julius Trump, Edmond Trump, James M. Jacobson and Albert Roth.

Clifford Gary Kosoff, John Francis Hennessy, Jr., James E. O'Halloran, O'Halloran, Kosoff & Miller, P.C., Northbrook, Ill., for defendant Robert A. Podesta.

Kenneth R. Gaines, Dennis P. Birke, Altheimer & Gray, John G. Jacobs, Robert Plotkin, Jonah Orlofsky, Plotkin & Jacobs, Ltd., Jeffrey Grant Brown, Law Office of Thomas J. Shannon, Ltd., Chicago, Ill., for defendant William W. Darrow.

Malcolm Hirsten Brooks, Thomas G. Gardiner, Elias N. Matsakis, Robert J. Block, McBride, Baker & Coles, Chicago, Ill., for defendants State Street Venture, One North State Street Ltd. Partnership, BA Mortg. and Intern. Realty Corp. and third-party defendants Boulevard Bank Nat. Ass'n, Bennett & Kahnweler Ass'n.

David Bodiker, Bodiker & Holland, Columbus, Ohio, for defendants Charles Schottenstein, Gary Schottenstein, Randee Schottenstein and Robert M. Schottenstein.

John W. Costello, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant Gen. Elec. Capital Corp.

Joseph B. Lederleitner, Neil Kevin Quinn, Mary Anne H. Capron, Pretzel & Stouffer, Chtd., Chicago, Ill., Sheri Bluebond, Arnold Quittner, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for defendant Porter, Wright, Morris & Arthur.

Gary Michael Elden, John R. McCambridge, Philip C. Stahl, Donald A. Vogelsang, George Robert Dougherty, Grippo & Elden, Chicago, Ill., for defendant Isham Lincoln and Beale.

Joel J. Africk, Rodney D. Joslin, Jenner & Block, Chicago, Ill., Kevin S. Anderson, Laventhol & Horwath, Philadelphia, Pa., for third-party defendant Laventhol & Horwath.

Jack Samuel Tenenbaum, Marvin Alan Tenenbaum, John R. McLain, Tenenbaum & Senderowitz, Chicago, Ill., Theodore Gewertz, Douglas K. Mayer, Wachtell, Lipton, Rosen & Katz, New York City, for third-party defendants AMA/WSI Inc., Alan Cohen, Anthony Grillo, and Lewis Kruger, trustee.

Julian Jawitz, third-party defendant pro se.

Peter G. Swan, David Alan Kaufman, Emalfarb, Swan & Bain, Highland Park, Ill., for third-party defendants Gilbert K. Granet, Gilbert K. Granet Inc., WSI Liquidation Trust, WSI Investors Inc., and Christopher A. Jansen.

Robert J. Kriss, Carrie Kiger Huff, Mayer, Brown & Platt, Chicago, Ill., for House-

hold Commercial Financial Services, trustee.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Pending before this court are the following three motions: (1) a motion for summary judgment of cross-defendant Isham, Lincoln & Beale ("Isham"); (2) a motion for summary judgment of cross-defendant Porter, Wright, Morris & Arthur ("PWMA"); and (3) a motion to dismiss the complaint and/or for partial summary judgment of defendants Julius Trump, Edmond Trump, MBT Corporation ("MBT"), Bond Industries, Inc. ("Bond"), and the Trump Group, Ltd. ("TGL") (collectively, "the Trump defendants"). For the reasons stated below, all three pending motions must be denied.

### I. BACKGROUND FACTS

As the parties are well aware, on December 20, 1985 WSI Acquisition Corporation ("WSI") acquired Wieboldt Stores, Inc. ("Wieboldt") in a leveraged buyout ("LBO"). On September 24, 1986 Wieboldt filed for relief under Chapter 11 of the Bankruptcy Code.

On September 17, 1987, Wieboldt's Chapter 11 trustee ("Trustee") filed this action against various defendants involved in the Wieboldt LBO, including members of Wieboldt's former Board of Directors. The Trustee alleged, in part, that the LBO constituted a fraudulent conveyance of Wieboldt's assets.

In November of 1988 this court granted certain defendants' motions to dismiss and denied the remaining defendants' motions to dismiss the Trustee's complaint. In that memorandum opinion and order the court detailed the alleged facts of the Wieboldt LBO. *See Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 493–496 (N.D.Ill. 1988).

After the denial of their motions to dismiss, the remaining defendants answered the Trustee's complaint and filed third-party complaints. In February of 1990 the court granted in part and denied in part certain motions to dismiss the third-party actions. *Wieboldt Stores, Inc. v. Schottenstein,* 111 B.R. 162 (N.D.Ill.1990).

This court has chronicled the general facts surrounding this litigation in its November, 1988 opinion and subsequent opinions. It need not rehash them here. Instead, the court shall discuss the facts relevant to each of the pending motions in the discussion section below.

### II. DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); Bankr.R. 7056. In ruling on a motion for summary judgment the evidence of the non-movant must be believed, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "[1] *Id.,* 475 U.S. at 587, 106 S.Ct. at 1356.

---

1. Defendants/cross-plaintiffs James M. Jacobson and Albert Roth in their response memoran-

## A. *Isham's and PWMA's Motions for Summary Judgment*

█ The first two motions pending before this court are Isham's and PWMA's motions for summary judgment on the cross-claims brought against them by defendants/cross-plaintiffs James M. Jacobson and Albert Roth.

Jacobson and Roth are two of the former members of Wieboldt's Board of Directors sued by the Trustee. Specifically, Jacobson and Roth were two of the nine members of the Wieboldt Board who voted to approve WSI's acquisition of Wieboldt.[2] The Trustee alleged that Jacobson and Roth breached their fiduciary duties to Wieboldt and violated the Illinois Business Corporation Act in approving the LBO.

In their second amended answer, Jacobson and Roth brought two cross-claims against Isham and PWMA. According to the cross-claims, on October 3, 1985 Wieboldt and its Board of Directors retained Isham and PWMA to render professional legal services and advice to Wieboldt and its Board with respect to WSI's proposed acquisition of Wieboldt. (Trump Second Amended Answer at 72, ¶ 1.) Wieboldt's Board allegedly authorized Isham and PWMA to work together to share common duties and responsibilities in connection with the proposed acquisition. (*Id.*)

According to the cross-claims, Isham and PWMA rendered legal services and advice to Wieboldt and the Board. Specifically, Isham and PWMA negotiated and structured the acquisition of Wieboldt by WSI, drafted documents necessary to implement the acquisition, performed due diligence, and rendered advice relied upon by the Board in approving the acquisition. (*Id.* at 73, ¶ 2.)

In their first cross-claim, Jacobson and Roth sought contribution from Isham and PWMA to the extent of any recovery by the Trustee from the Trump defendants. (*Id.* at 76, ¶ 10.) Jacobson and Roth based their contribution claim on Isham and PWMA's alleged negligence in advising the Board relating to the acquisition of Wieboldt by WSI. (*Id.* at 76, ¶ 9.) In an opinion dated March 16, 1991, this court dismissed the Jacobson and Roth contribution claim. *Wieboldt v. Schottenstein,* No. 87 C 8111, slip op. at 1 (N.D.Ill. Mar. 16, 1991).

Jacobson and Roth bring their second cross-claim against Isham and PWMA for legal malpractice—legal malpractice in representing Wieboldt and its Board. (*Id.* at 76, ¶ 12.) It is this remaining cross-claim upon which Isham and PWMA now seek entry of summary judgment.

dum to Isham and PWMA's motions for summary judgment cited only the law of summary judgment prior to the Supreme Court's crucial and well-known *Celotex* and *Anderson* decisions. *See* Response Mem. at 13. Such dated law imposes a lower and legally incorrect burden on non-movants Jacobson and Roth. *See, e.g., id.* at 13, *citing Moutoux v. Gulling Auto Electric, Inc.,* 295 F.2d 573 (7th Cir.1961) for the proposition that summary judgment should not be granted if there is "any doubt" as to the material facts.

Could Jacobson and Roth be unaware of the well-settled law of summary judgment in this country which has governed Rule 56 motions for the past half decade? If so, their unawareness of the law would be startling, especially given Isham's and PWMA's citation of the relevant law in their well-written memoranda in support of summary judgment. *See* Isham Mem. in Support at 10; PWMA Mem. in Support at 5.

It is clear, however, that counsel for Jacobson and Roth knew, but consciously did not cite, the

relevant case law governing Rule 56 motions. This is clear because when Jacobson and Roth's counsel, Mr. Wolosky, *moved* for summary judgment on behalf of the Trump defendants in the motion for partial summary judgment also pending before this court, he cited *Anderson*. *See* Mem. of Trump Defendants to Dismiss or Alternatively for Partial Summary Judgment, at 2–3. *Anderson* imposes a higher burden on non-movants in resisting summary judgment—a burden which Mr. Wolosky obviously sees fit to bring to this court's attention only when it will benefit his client.

To the extent that Mr. Wolosky attempted to deceive this court as to the appropriate summary judgment standard in resisting Isham and PWMA's motions for summary judgment, Mr. Wolosky's attempt was both unsuccessful and improper.

**2.** Jacobson and Roth were directors of Wieboldt from June 4, 1984 until December 19, 1985, when they resigned in connection with the acquisition of Wieboldt by WSI.

In an action for legal malpractice, a plaintiff must prove that the defendant attorneys owed plaintiff a duty of due care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the plaintiff suffered injury. *Sexton v. Smith*, 112 Ill.2d 187, 97 Ill.Dec. 411, 413–14, 492 N.E.2d 1284, 1286–87 (1986). Isham and PWMA argue that Jacobson and Roth have failed to raise a genuine issue of material fact as to each of these essential elements of Jacobson and Roth's claim. The court finds otherwise.

### 1. Attorney–Client Relationship and Duty of Care

Both Isham and PWMA assert that there is no true dispute that Wieboldt, rather than the individual Board members, employed the law firms. Accordingly, Isham and PWMA argue that there existed no attorney-client relationship between the law firms and Jacobson and Roth. Jacobson and Roth, however, have presented evidence raising a genuine issue of material fact on this point.

For example, when Harry L. Henning, the PWMA partner primarily responsible for PWMA's advice relating to Wieboldt's negotiations with WSI, was asked whether PWMA was representing Wieboldt Stores in late 1985, Mr. Henning responded:

I don't know how to answer the question. I'll describe what I think is an accurate representation of the facts, and then you can draw your own conclusion from that.

In the October 3rd, 1985 meeting of the directors of Wieboldt Stores, *the board* authorized the law firms of Isham, Lincoln & Beale and Porter, Wright to work together in connection with the proposed tender offer by WSI Acquisition, Inc.

(Henning Dep. at 125, Jacobson/Roth Ex. 1 (emphasis added).) Indeed, the minutes of the October 3, 1985 Board meeting referred to by Mr. Henning reflect that *"[t]he Board* authorized Messrs. Harris [of PWMA] and Darrow [of Isham] and their respective law firms to work with the tender offer group to draw up an acceptable tender offer agreement to present *to the Board* at the earliest possible date." (Jacobson/Roth Ex. 2 at 11–12 (emphasis supplied).)

Mr. Henning further testified that, among other persons, Irving Harris, another member of Wieboldt's Board, informed Mr. Henning that PWMA would be "working with Bill Darrow [a member of Wieboldt's Board and also 'Of Counsel' at Isham at the time of the acquisition] and expected to help us, *the board*, in this transaction [with WSI]."[3] (Henning Dep. at 151–52 (emphasis added).) Mr. Henning further stated that his assignment with PWMA was as co-counsel with Isham "for the benefit of Wieboldt and shareholders *and directors."* (*Id.* at 848 (emphasis added).) According to Mr. Henning, the formal arrangement that developed between Isham and PWMA was that the two law firms would "work together as though [they] were members of a common team of people trying to accomplish a given objective for the benefit of the client." (*Id.* at 152–53.)

Similarly, O. Kirby Colson, III, one of the Isham partners who worked with the WSI acquisition, stated that the attorneys working on the acquisition:

... were all concerned about [the fraudulent conveyance problem] and wanted to be sure that the directors understood what it meant and the analysis that they needed to make, and everything else sort of flowed from there.

There were, of course, conversations with others besides the directors, but the directors were our principal focus.

(Colson Dep. at 190, Jacobson/Roth Ex. 4.) Mr. Colson further stated that "[m]aking sure that the board understood what they were doing was an important duty and was one that we thought was deserving a lot [of] attention and got a lot of attention." (*Id.* at 403.)

---

**3.** For similar evidence, see Henning Dep. at 226, 323–24, 502, 745, and Colson Dep. at 458, 623– 24, Jacobson/Roth Ex. 4.

Mr. Henning, Mr. Colson, Mr. Darrow and Jon L. Lind (another Isham attorney working on the acquisition) have submitted affidavits stating that their respective law firms represented Wieboldt, not individual board members such as Mr. Jacobson and Mr. Roth. However, on this motion for summary judgment this court must believe the evidence of Mr. Jacobson and Mr. Roth, drawing all justifiable inferences in their favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

Under Illinois law, the attorney-client relationship is consensual and arises only when both the attorney and the client have consented to its formation. *Torres v. Divis*, 144 Ill.App.3d 958, 98 Ill.Dec. 900, 904, 494 N.E.2d 1227, 1231 (2d Dist.1986). "The client must manifest his authorization that the attorney act on his behalf, and the attorney must indicate his acceptance of the power to act on the client's behalf." *Id.*

If the court were the trier of fact in this case, it might well determine that Isham and PWMA did not consent to represent Mr. Jacobson and Mr. Roth individually. However, this court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. The evidence presented by Mr. Jacobson and Mr. Roth raises a genuine issue of material fact regarding whether Isham and PWMA represented the members of Wieboldt's Board in their negotiations with WSI for sale of Wieboldt. Accordingly, there remains a genuine dispute sufficient to resist summary judgment as to whether Isham and PWMA owed a duty of due care to Mr. Jacobson and Mr. Roth.

### 2. Breach of Duty of Care

Similarly, there remains a genuine issue of material fact whether Isham and PWMA breached any duty of care owed to Mr. Jacobson and Mr. Roth. Mr. Jacobson and Mr. Roth present evidence that the law firms breached their duty of care in two ways.

First, Jacobson and Roth argue that the law firms negligently advised the Board that the fraudulent conveyance laws would not apply to the transaction as the attorneys had structured it and negligently failed to disclose to the directors the existence of legal authority to the contrary. The parties do not dispute that the law firms failed to advise Jacobson and Roth of the decision in *United States v. Gleneagles Investment Co.*, 565 F.Supp. 556 (M.D.Pa. 1983), a decision which Jacobson and Roth contend indicated that the sale of Wieboldt to WSI could subject the directors to liability under fraudulent conveyance law.

Jacobson and Roth's proposed legal expert, Professor Marshall Shapo, stated in his sworn affidavit that the failure of Isham and PWMA to disclose to the directors the *Gleneagles* decision, and how it in effect collapsed a multi-stage transaction analogous to the one that the law firms had structured for Wieboldt, was a breach of the law firms' duty of care. (Shapo Aff. at ¶ 6, Jacobson/Roth Ex. 8.) This evidence is sufficient to raise a genuine issue of material fact as to whether Isham and PWMA breached a duty care to Jacobson and Roth by failing to fully inform them as to their potential liability under fraudulent conveyance law.[4]

Jacobson and Roth's second contention relating to breach of a duty of care is that Isham and PWMA failed to communicate to them information that Wieboldt would not receive $8.5 million in new, additional working capital following its acquisition by WSI. According to evidence presented by Jacobson and Roth, shortly before the closing of the deal with WSI, Mr. Darrow "was informed that there was going to be very little, in fact, in the way of working capital that would come out of this transaction [with WSI]." (Darrow Dep. at 633, Jacobson/Roth Ex. 12.) Although he was a member of the Wieboldt Board at the time

---

**4.** Isham has challenged Professor Shapo's qualifications. For purposes of this motion for summary judgment, however, the court finds Professor Shapo's evidence, in conjunction with all other evidence presented by Jacobson and Roth, sufficient to withstand the law firms' motions for summary judgment.

and "Of Counsel" with Isham, Mr. Darrow did not inform any other members of the Board of this information. (*Id.* at 635–36.)

Again, Jacobson and Roth's proposed legal expert, Professor Shapo, stated in his affidavit that failure by the law firms to disclose, prior to closing, information indicating that there was a substantial drop in the amount of expected working capital from the sale of Wieboldt to WSI, constituted a breach in the law firms' duty of care. (Shapo Aff. at ¶¶ 3–5.) Professor Shapo's affidavit, combined with all other evidence presented by Mr. Jacobson and Mr. Roth, raises a genuine issue of material fact regarding whether Isham and PWMA breached a duty care to Mr. Jacobson and Mr. Roth by failing to communicate to the Board that Wieboldt would not receive the expected additional working capital following its acquisition by WSI.

### 3. Proximate Causation

Isham argues that Jacobson and Roth have failed to raise a genuine dispute regarding whether the alleged negligence proximately caused any injury. The court believes otherwise.

Jacobson and Roth have presented evidence from which a reasonable jury could conclude that Jacobson and Roth relied upon the legal advice given by the law firms regarding whether fraudulént conveyance law would apply to the Wieboldt acquisition as structured. *See, e.g.,* Henning Dep. at 623–24, Jacobson/Roth Ex. 5; Jacobson Dep. at 1032–33, 1035, 1042, Jacobson/Roth Ex. 6. Based upon all of the evidence presented by Jacobson and Roth, there is a genuine issue of material fact as to whether Jacobson and Roth would have voted differently had they been more fully apprised of the implications of their actions under applicable fraudulent conveyance law.

Jacobson and Roth also have offered evidence that the amount of additional working capital to be received by Wieboldt from the acquisition was an assumption which was important and well-known both to the members of Wieboldt's Board and to the Isham and PWMA attorneys working on the acquisition. *See, e.g.,* Henning Dep. at 335–338, 541, 811–13, 821, 823, Jacobson/Roth Ex. 1; Henning Dep. at 580, Jacobson/Roth Ex. 5. Based upon testimony of Mr. Darrow, Isham argues that cancelling the closing of the deal with WSI would have been "horrendous" and thus Mr. Jacobson and Mr. Roth would not have voted against the acquisition even if the law firms had informed them of Wieboldt's expected lack of new working capital. (Isham Reply at 7–8.) Based upon all of the evidence presented, however, especially evidence of reliance by the Wieboldt directors on information provided by the law firms, it is a disputed issue of material fact whether Jacobson and Roth would have voted against the acquisition had they known that the acquisition would result in no new working capital.

In summary then, because Mr. Jacobson and Mr. Roth have presented evidence raising a genuine issue of material fact as to each required element of a claim for legal malpractice, Isham and PWMA's motions for summary judgment on that claim must be denied.[5]

### B. The Trump Defendants' Motion to Dismiss and/or for Partial Summary Judgment

The Trump defendants have moved to dismiss or, in the alternative, for partial summary judgment on Counts I, II and VII of the Trustee's Amended Complaint and Counts XII through XVI of the Trustee's amendment to the Amended Complaint. The Trump defendants raise several arguments in support of their motion.

---

**5.** PWMA argues that *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982) bars Jacobson and Roth from recovering damages under a legal malpractice theory. This court believes, however, that if faced squarely with the issue, the Illinois Supreme Court would rule consistent with its dictum in *2314 Lincoln Park West Con-* *dominium Assn. v. Mann,* 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990). In *2314 Lincoln Park West* the Court stated that "since *Moorman,* malpractice actions against attorneys have gone forward, without any suggestion that the form of recovery traditionally recognized in such actions would no longer be allowed." *Id.,* 144 Ill.Dec. at 234, 555 N.E.2d at 353.

### 1. 11 U.S.C. Section 546(e) [6]

■ The Trustee alleges that Julius and Edmond Trump tendered their Wieboldt stock "through" MBT.[7] According to the Trump defendants, this tender went as follows.

WSI appointed Harris Trust and Savings Bank ("Harris Bank"), a financial institution, to act as depositary and disbursing agent to acquire all of the issued and outstanding shares of Wieboldt stock. WSI's Offer to Purchase for Cash ("Offer") instructed the tendering stockholders to surrender their Wieboldt shares to Harris. The Offer then required Harris to disburse the payments to the tendering shareholders upon its receipt "of certificates for such shares, or a timely confirmation of a book entry transfer of such shares into the Depositary's account at the Depositary Trust Company ('DTC'), the Midwest Securities Transfer Company ('MSTC') or The Pacific Securities Depository Trust Company ('PSDTC')...." (Trump Def. 12(m) Statement of Uncontested Facts, ¶ 15.)

Pursuant to the procedures set forth in the Offer, MBT surrendered its Wieboldt shares to Harris Bank and received a payment in the amount of $6,480,972.00 made by Harris Bank in a check made payable to MBT. (*Id.*, ¶ 18.)

Based upon these alleged facts, the Trump defendants argue that they are entitled to summary judgment on Counts II, VII, XIII and XIV [8] based on application of 11 U.S.C. Section 546(e) ("Section 546(e)"). Specifically, based upon these facts the Trump defendants argue that the payments MBT received from Harris Bank were "set-

tlement payments" within the meaning of Section 546(e). Accordingly, the Trump defendants maintain that Section 546(e) bars the Trustee from avoiding any transfer to the Trump defendants. The court disagrees.

Where, as here, the question is one of statutory construction, the court begins with the language of the statute. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Here, however, the language of the statute is not dispositive in determining whether Section 546(e) bars the Trustee's claims.

The critical language in Section 546(e) is the term "settlement payment." Section 741(8) of the Bankruptcy Code, with circuitous verbiage, rather cryptically defines "settlement payment" as follows:

"[S]ettlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8). This circular definition lacks the sort of "plain meaning" urged by the Trump defendants which would preclude this court from looking further in construing Section 546(e).

Thus, the court resorts to an examination of the legislative history of Section 546(e). Several courts and commentators recently have carefully detailed the legislative history of Section 546(e). *See, e.g., In re Kaiser Steel Corp.*, 105 B.R. 639, 651 (Bkrtcy. D.Colo.1989); *Bevill, Bresler & Schulman*

---

**6.** 11 U.S.C. § 546(e) states in relevant part: Notwithstanding sections 544, 545, 547, 548(a), and 548(b) of this title, the trustee may not avoid a transfer that is a ... settlement payment, as defined in section ... 741(8) of this title, made by or to a ... financial institution ..., that is made before the commencement of the case, except under section 548(a)(1) of this title.

**7.** MBT is a former shareholder of Wieboldt which tendered 480,072 shares pursuant to the tender offer. (Trump Def. 12(m) Statement of Undisputed Facts, ¶ 5.) Julius and Edmond Trump, together with other persons, were directors of MBT. (*Id.*, ¶ 8.)

**8.** Count II alleges, *inter alia*, that the proceeds received by MBT upon the tender of its Wieboldt shares constituted a fraudulent conveyance under Section 548(a)(2) of the Bankruptcy Code. Count VII asserts a similar claim under Illinois fraudulent conveyance law. Counts XIII and XIV are fraudulent conveyance claims (federal law and Illinois law, respectively) against The Trump Group, Ltd. ("TGL") and Bond based upon the claim that MBT deposited the proceeds of its Wieboldt shares in an account maintained by TGL as a depository for the benefit of Bond.

*Asset Management Corp. v. Spencer Savings & Loan Assn.*, 878 F.2d 742, 751 (3rd Cir.1989); *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 848–49 (10th Cir.1990); Neil M. Garfinkel, Note, *No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO*, 1991 Colum.Bus.L.Rev. 51, 61–63 ("*Note*").

A review of the legislative history of Section 546(e) reveals that Congress exempted settlement payments in the commodities (and later the securities) industry out of concern that the bankruptcy of one party in the clearance and settlement chain[9] could spread to other parties in that chain.[10] *See, e.g., Bevill*, 878 F.2d at 747, 751; *Kaiser Steel*, 913 F.2d at 849; *Note* at 62. As the court in *Bevill* put it:

**9.** In the context of the securities industry, the "clearance and settlement" system works roughly as follows:

[T]ypically, when a customer wishes to buy a security, he or she places an order with his or her broker, who purchases the security from another broker, who is acting on behalf of a party who has placed an order to sell. Once the trade has been agreed upon, the process by which the security is delivered in exchange for the purchase price is known as "clearance and settlement." The clearing agency compares the trades its member brokers have made to arrive at an accounting of the day's transactions, which it then uses to establish each broker's money and securities settlement obligations. Finally, the trades are "settled"—funds and securities are delivered in satisfaction of the obligations.

*Note* at 64, *citing Bankruptcy of Commodity and Securities Brokers, 1981: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary* at 244, 301–04, 97th Cong., 1st Sess. 203 (1981) (statement of Mr. Bevis Longstreth, Commissioner of the SEC) *and* Exchange Act Release No. 34–13, 163 at nn. 54–56 (Jan. 13, 1977).

**10.** The threat to other parties in the chain occurs because of a system of independent guarantees:

[E]ach participant in the chain guarantees that he or she will make good on his or her obligation. The buying broker guarantees that he or she will deliver funds in exchange for the securities. The selling broker guarantees he will deliver the security in exchange for funds. Because the comparison and settlement process is not instantaneous, however, the clearing agency must guarantee to the seller that it will deliver the funds, and it must also guarantee to the buyer that it will deliver the securities. In the event of a de-

Congress was concerned about the volatile nature of the commodities and securities markets, and decided that certain protections were necessary to prevent "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market."

878 F.2d at 747, *quoting* H.Rep. No. 97–420, 97th Cong., 2d Sess. 1 (1982), U.S.Code Cong. & Admin.News 1982, p. 583.

In the instant case, however, requiring the Trump defendants (or other Wieboldt shareholders) to return to the Trustee payments they received from WSI through Harris Bank poses no significant threat to those in the clearance and settlement chain.[11] Neither Harris nor any other financial intermediary purportedly involved

fault by any party in the chain, the clearing agency must still make good on its guarantee, which it can do by calling on a backup clearing fund provided by its members. Brokers and other intermediaries require collateralization of their respective risks by means of various types of margin payments. This system depends upon the availability of the respective guarantees to the clearing agency; without them, the potential exposure is tremendous.

*Note* at 64–65, *citing Bankruptcy of Commodity and Securities Brokers, 1981: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary* at 301, 97th Cong., 1st Sess. 203 (1981) (statement of Jack Nelson, President, National Securities Clearing Corporation) *and Group of Thirty, Clearance and Settlement Systems in the World Securities Markets* at 39 (1989).

**11.** As one commentator has stated:

The inviolability of payments to shareholders is simply not basic to the operation of the clearance and settlement systems. Those systems will be only incidentally affected, if at all, if former shareholders are required to return payments they received in an LBO. Neither the system of guarantees nor the solvency of participants in the chain is threatened by a legal order in which payments to the shareholders by their brokers are subject to recovery by a trustee in bankruptcy. Thus, while the flows of funds to and between financial intermediaries in the clearance and settlement chain must be protected in order to insure the stability of those systems, funds flowing from the intermediaries to the shareholders do not require protection, and section 546(e) should therefore not apply.

*Note* at 66–67.

in the clearance and settlement process [12] would be meaningfully affected by such a judicial order.

Thus, although the legislative history of Section 546(e) is not dispositive *per se* of whether the section bars the Trustees claims, the section's legislative history, when combined with consideration of the system which Section 546(e) was designed to protect, convince this court that Section 546(e) does not bar the Trustee's claims against the Trump defendants.[13]

### 2. 11 U.S.C. Section 550

■ The Trump defendants next argue that the Trustee has failed to allege and cannot prove a basis upon which he is entitled to a money judgment against defendants Julius and Edmond Trump.

Specifically, the Trump defendants challenge Counts I, II, and VII.[14] Section 550 of the Bankruptcy Code states that in avoiding a fraudulent conveyance under Section 548, the Trustee may recover the property transferred or the value of such property from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1) ("Section 550"). The Trustee's right of recovery under Section 548 depends upon Section 550. *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 891 (7th Cir.1988). The Trump defendants argue that the Trustee has failed to raise a genuine issue of material fact regarding whether Julius and Edmond Trump received or benefited from the $6,480,972.00 which MBT received for the Wieboldt stock it held. Again, the court believes otherwise.

The Bankruptcy Code does not define "transferee" and there is no legislative history on the point. *Bonded*, 838 F.2d at 893. Nonetheless, the Seventh Circuit Court of Appeals has held that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* The Trustee has presented evidence from which a rational trier of fact could conclude that the Trump brothers had dominion over the LBO proceeds.

For instance, the parties do not dispute that MBT received a payment in the amount of $6,480,072.00 in the LBO. (Trump Def. 12(m) Statement, ¶ 18.) Some unknown person endorsed the check for MBT and deposited the money in an account maintained by TGL ("the TGL Account"). (PX 213 (Tab 1 [15]); PX 623 at 1–2 (Tab 2).) According to MBT, TGL is, and has been an inactive corporation. (PX 623 at 6.) However, between 1983 and 1986 Julius and Edmond Trump served as Chairman/Treasurer and President of TGL, respectively. (T5763, T5767–68, T5750–53, T5759–60 (Tab 7).)

In addition to serving as officers, between 1983 and 1986 Julius Trump personally withdrew almost $400,000.00 in funds from the TGL Account, and Edmond Trump withdrew over $300,000.00 from the account. (PX 214 and Summary thereof (Tabs 4–5).) This evidence raises a genuine issue of material fact as to whether the Trump brothers had dominion over the LBO monies deposited in the TGL Account such that they were "transferees" within the meaning of Section 550.

---

**12.** Wieboldt argues that Harris Bank was not even a "financial institution" involved in the clearance and settlement process because it was neither a clearing depository nor broker-dealer with respect to the Trump defendants. (Wieboldt Mem. in Opp. at 9.)

**13.** The Supreme Court has cautioned, "[I]n expounding a statute, we [are] not ... guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989).

**14.** Count I alleges that the amounts transferred to Julius and Edmond Trump, among others, for their shares of Wieboldt stock constituted a fraudulent conveyance in violation of Section 548(a)(1) of the Bankruptcy Code. Count II alleges a fraudulent conveyance in violation of Section 548(a)(2) of the Code. Count VII alleges a violation of Illinois fraudulent conveyance law.

**15.** "Tab" refers to the tabbed exhibits to the Trustee's response memorandum.

■ Even if a jury finds the Trump brothers not to be transferees of the LBO proceeds, the Trustee has presented sufficient evidence for a reasonable trier of fact to conclude, in the alternative,[16] that the Trump brothers were the persons for whose benefit the transfer of the LBO funds was made within the meaning of Section 550. According to the Trustee's evidence, TGL is the parent or umbrella corporation of MBT, Bond, and several other corporations. (Jacobson Dep. at 12–16 (Tab 6).) Even though Julius and Edmond Trump transferred their shares of Wieboldt to MBT and later to Bond, the Trustee has offered abundant evidence that the Trump brothers maintained control over their Wieboldt stock through MBT. (Tab 8, Tab 9 at Exhibit A, Tab 10 at p. 20, Tab 11, and Tabs 13–21.)

Section 550(a)(1) requires that the transfer have been made "for the benefit" of the entity from whom the Trustee seeks recovery. It does not require that the entity actually *receive* the benefit. *In re Universal Clearing House Co.*, 62 B.R. 118, 127 (D.Utah 1986). Even if the Trump brothers were not transferees under Section 550, the Trustee's evidence that they funnelled the LBO proceeds through several corporations under their control leaves as a genuine issue of material fact whether Julius and Edmond Trump were the persons for whose benefit transfer of the LBO funds was made under Section 550.

3. Liability of Julius Trump, Edmond Trump, Bond and MBT as Principals for the Alleged Misconduct of James Jacobson and Albert Roth

■ The Trump defendants next argue that Julius Trump, Edmond Trump, Bond and MBT cannot be held derivatively or vicariously liable for the breach of fiduciary duty (Count XV) or approval of prohibited distributions (Count XVI) by Jacobson and Roth in connection with the Wieboldt tender offer. There remains, however, a genuine issue of material fact on this point.

Under Illinois law, an agent is one who "acts under authority from another to transact business for him or manage his affairs, and who is required to act for such other." *Clapp v. JMK/Skewer, Inc.*, 137 Ill.App.3d 469, 92 Ill.Dec. 187, 190, 484 N.E.2d 918, 921 (3rd Dist.1985). The existence of an agency relationship is a question for the trier of fact. *Matthews Roofing Co. v. Community Bank & Trust Co.*, 194 Ill.App.3d 200, 141 Ill.Dec. 143, 147, 550 N.E.2d 1189, 1193 (1st Dist.1990).[17] The existence and extent of an agency relationship may be established "by circumstantial evidence based upon the examination of the situation of the parties, their acts and other relevant circumstances." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 27, 545 N.E.2d 672, 680 (1989).

The court rejects the Trump defendants' argument that under no circumstances can corporate directors have an agency relationship with shareholders of a corporation. Although such a relationship may be unlikely, as noted, under Illinois law, if a trier of fact finds that one person has the right to control the actions of another at a given time, the trier of fact may find that the relation of principal and agent exists. *Illinois Pattern Jury Instructions—Civil*, No. 50.05 at 234; *see also Clapp*, 92 Ill. Dec. at 190, 484 N.E.2d at 921. The Trump defendants have cited no case law to the contrary.

Indeed, in *Citibank, N.A. v. Data Lease Financial Corp.*, 828 F.2d 686 (11th Cir. 1987), the court held that there remained a

---

**16.** The categories "transferee" and "entity for whose benefit such transfer was made" are mutually exclusive. *Bonded*, 838 F.2d at 896.

**17.** The Illinois Pattern Jury Instructions define an agent as follows:

An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts business, manages some affair, or does some service for the principal, with or without compensation. The agreement may be oral or written, express or implied.

If you find that one person has the right to control the actions of another at a given time, you may find that the relation of principal and agent exists, even though the right to control may not have been exercised.

*Illinois Pattern Jury Instructions—Civil*, No. 50.05 at 234 (2d ed. 1971).

genuine issue of material fact regarding whether members of a corporation's board of directors were acting as agents of shareholder Citibank, which had voted its shares to elect all of the board members. The court held that whether the directors were agents of Citibank depended on the factual question of whether Citibank exercised "control and domination" over the directors. *Id.* at 691–92.

The Trustee has presented abundant evidence from which a rational trier of fact could conclude that Jacobson and Roth were acting as agents of Julius Trump, Edmond Trump, Bond and MBT. For instance, according to the Trustee's evidence, Julius Trump requested that Jacobson and Roth serve as directors of Wieboldt. (Jacobson Dep. at 43 (Tab 6); Roth Dep. at 58 (Tab 24); J. Trump Dep. at 38 (Tab 25).) At the 1984 Annual Meeting of Wieboldt's shareholders, QPO Corporation, a wholly-owned subsidiary of MBT and the record owner of the 480,072 shares of Wieboldt stock owned by MBT, nominated Jacobson and Roth for election as directors of the Wieboldt Board. Jacobson and Roth indeed were elected to the Board at that meeting. (S.E.C. Schedule 13D Amendment No. 1, signed by Julius and Edmond Trump (Tab 28).)

Jacobson was an officer and director of Bond, as well as a member of Bond's executive committee throughout the time he served as a director of Wieboldt. (TR1841 (Tab 29); TR1843 (Tab 30); PX 150 at 12 (Tab 21); Jacobson Dep. at 10–12, 18–19 (Tab 6).) As an attorney for the law firm which serviced Julius and Edmond Trump, Bond, and MBT, Jacobson billed TGL for time spent serving as a Wieboldt director, including time spent attending Wieboldt board meetings. (PX 618A (Tab 31); Jacobson Dep. at 862–72 (Tab 6).)

Moreover, in a memorandum dated December 31, 1984, Jacobson stated:

... I am a Director [of Wieboldt] *representing the Trump interests* who are opposed to [a proposed leased furniture department] arrangement. Consequently, we are anxious to raise any and all points on the lease which would evidence the "non arms-length" nature of the agreement. This would obviously cover business as well as legal points.

(PX 129 (Tab 32) (emphasis supplied).) [18] Jacobson and Roth later did raise a variety of points to the Wieboldt Board and other directors which would evidence the non arms-length nature of the agreement. (PX 135 at 2–3, 5–11 (Tab 33); Jacobson Dep. at 163–64, 167–72 (Tab 6); Roth Dep. at 236–37 (Tab 24).)

The Trustee has introduced additional evidence reflecting that Jacobson and Roth acted on behalf of the Trump interests.[19] In fact, the Trustee has presented a veritable blizzard of evidence raising a genuine issue of material fact regarding whether Jacobson and Roth acted as agents of Julius Trump, Edmond Trump, Bond and MBT in connection with the LBO. Consequently, the Trump defendants' motion for summary judgment on this issue is denied.

#### 4. Statute of Limitations

Finally, the Trump defendants assert that Counts XIV, XV, and XVI are barred by Illinois' statutes of limitation, which the Trump defendants claim govern those claims pursuant to Section 108(a) of the Bankruptcy Code. Section 108(a) states in pertinent part:

If applicable nonbankruptcy law ... fixes a period within which *the debtor* may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

---

18. Roth made a similar statement that he, too, was a representative of MBT. (Roth Dep. at 88 (Tab 24).)

19. *See, e.g.,* PX 117 (Tab 22); Jacobson Dep. at 66–68, 517–25, 821–22 (Tab 6); PX 352 at 6 (Tab 34); Huff Dep. at 127–29 (Tab 38); PX 285 at MH743 (Tab 39); PX 28 at 13 (Tab 40); PX 490 at 21–22 (Tab 41); PX 85 at 3, 7 (Tab 42); PX 248 (Tab 43); PX 248A (Tab 44); PX 212 (Tab 45); PX 496 at 32 (Tab 46).

(2) two years after the order for relief.

11 U.S.C. § 108(a) ("Section 108(a)") (emphasis added).

#### a. Count XIV

■ Count XIV asserts a fraudulent conveyance claim under Illinois law against Bond and TGL. The court finds that Section 108(a) does not govern Count XIV and thus does not bar it.

Although the Trustee bases Count XIV on the Illinois fraudulent conveyance statute, the Trustee brings it pursuant to the authority granted to him under Section 544(b) of the Bankruptcy Code. Section 544(b) confers upon the Trustee the power to avoid any of Wieboldt's transfers or obligations that are voidable for fraud or any other reason under applicable state or federal law. 11 U.S.C. § 544(b); 4 *Collier on Bankruptcy* ¶ 544.03[1] at 544–20 (15th ed. 1990). Section 546(a) of the Code specifies the time within which the Trustee must act under Section 544(b). 11 U.S.C. § 544(b) ("Section 544(b)"); 4 *Collier on Bankruptcy* ¶ 544.03[2] at 544–22.[20]

The Trump defendants do not argue that Count XIV was not timely filed under the limitations period provided in Section 546(a). Accordingly, the Trump defendants' motion for summary judgment based on the statute of limitations is denied as to Count XIV.

#### b. Counts XV and XVI

■ Count XV is a state-law claim against Julius Trump, Edmond Trump, Bond and MBT as principals for the breach of fiduciary duty of their alleged agents Jacobson and Roth. Count XVI asserts state-law agency liability of Julius Trump, Edmond Trump, Bond and MBT as principals for alleged prohibited distributions by Jacobson and Roth.

The Trustee brings Counts XV and XVI pursuant to Section 544(a) of the Code. Section 544(a) grants the Trustee the power to avoid transfers voidable by a judicial lien creditor, unsatisfied execution creditor, or bona fide purchaser of real property. 11 U.S.C. § 544(a); 4 *Collier on Bankruptcy* ¶ 544.01 at 544–3 to 544–4.

The Trustee cites *In re Western World Funding Inc.*, 52 B.R. 743, 773–75 (Bkrtcy. D.Nev.1985) in support of its conclusion that it is bringing Counts XV and XVI under Section 544. *Western World* involved a trustee bringing a breach of fiduciary duty claim under Section 544. The court in *Western World* noted that when a trustee brings a claim such as breach of fiduciary duty, he or she brings the claim "in the name of the corporation for the benefit of all persons entitled to participate in the recovery." *Id.* at 773. Accordingly, the trustee is acting in his capacity *as a creditor* under Section 544(a) to bring a "creditors' bill" to reach choses in action belonging to the debtor. *Id.*[21]

Because the court finds that the Trustee brings Counts XV and XVI pursuant to Section 544(a), Counts XV and XVI are governed by the statute of limitations provided by Section 546(a). *Hansen*, 114 B.R. at 933 ("§ 546(a) does not distinguish between § 544(a) and § 544(b).") Again, because the Trump defendants do not argue that Counts XV and XVI were not timely filed in accordance with the time limitations of Section 546(a), the Trump defendants' motion for summary judgment as to Counts XV and XVI must be denied as well.[22]

---

**20.** *See also, In re McGoldrick,* 117 B.R. 554, 561 (Bkrtcy.C.D.Cal.1990); *In re Hansen,* 114 B.R. 927, 932 (Bkrtcy.N.D.Ohio 1990); *In re Mahoney, Trocki & Assoc., Inc.,* 111 B.R. 914, 920 (Bkrtcy.S.D.Cal.1990); *In re Downtown Investment Club III,* 89 B.R. 59, 65 (9th Cir. BAP 1988).

**21.** The Trump defendants' citation to a footnote in *Mahoney,* 111 B.R. at 920 n. 6, is unavailing. One of the cases cited in the *Mahoney* footnote is *In re Radcliffe's Warehouse Sales, Inc.,* 31 B.R. 827 (Bkrtcy.W.D.Wa.1983). The court in *Radcliffe's* held that because a trustee's right to bring an action under a state bulk sales law was derived from the individual aggrieved creditors pursuant to Section 544, Section 108(a) did not govern the applicable statute of limitations. *Id.* at 832.

**22.** Naturally, the Trump defendants' motion to reconsider this court's June 7, 1991 Memorandum Opinion and Order permitting the Trustee

## III. CONCLUSION

For the reasons stated in this memorandum opinion and order: (1) the motion for summary judgment of cross-defendant Isham, Lincoln & Beale is DENIED; (2) the motion for summary judgment of cross-defendant Porter, Wright, Morris & Arthur is DENIED; and (3) the motion to dismiss the complaint and/or for partial summary judgment of defendants Julius Trump, Edmond Trump, MBT Corporation, Bond Industries, Inc. and the Trump Group, Ltd. is DENIED. Trial of this case will begin promptly on October 21, 1991, at 10:00 a.m.

to amend his complaint adding Counts XIV, XV, and XVI likewise is denied.